COMMONWEALTH *vs.* MARLON PASSLEY.

Suffolk. December 8, 1998. - February 9, 1999.

Present: WILKINS, C.J., LYNCH, GREANEY, FRIED, & IRELAND, JJ.

*Practice, Criminal,* Argument by prosecutor, Cross-examination by prosecutor, Assistance of counsel, Capital case. *Evidence,* Cross-examination, Expert opinion.

At the trial of a murder indictment, the prosecutor properly argued, based on the evidence, that no unbiased alibi witnesses had testified to facts that would have precluded the defendant from being at the scene of the murder at the time it occurred. [836-837]

No substantial likelihood of a miscarriage of justice arose at a murder trial from the prosecutor's closing argument about the defendant's alibi witnesses, to which the defendant did not object, where the judge gave a strong instruction to the jury that closing arguments are not evidence, where there was strong identification testimony from witnesses who knew the defendant prior to the murder, and where the jury had an opportunity to evaluate witness credibility. [837-838]

At the trial of a murder indictment, no substantial likelihood of a miscarriage of justice was created by the prosecutor's exploring on cross-examination whether defense witnesses had an opportunity to collude. [838-840]

Where the judge at a murder trial admonished the jury to disregard a question the prosecutor posed on cross-examination, to which the defendant had objected, the jury was presumed to have followed the judge's direction. [840-841]

At a murder trial, the judge did not err in allowing in evidence expert testimony regarding a small bloodstain of indeterminate age and origin found on the defendant's shirt. [841]

There was no merit to a defendant's claim on appeal that he had received ineffective assistance of counsel. [841]

INDICTMENTS found and returned in the Superior Court Department on September 28, 1995.

The cases were tried before *Robert W. Banks,* J.

*Mary T. Rogers* for the defendant.

*Kristine Luongo Tammaro,* Assistant District Attorney, for the Commonwealth.

LYNCH, J. Following a Superior Court trial, a jury convicted

the defendant of murder in the first degree by deliberate premeditation and extreme atrocity or cruelty, assault and battery by means of a dangerous weapon (two indictments), armed assault with intent to murder (two indictments), one count of assault by means of a dangerous weapon, and unlawful possession of a firearm. On appeal, the defendant claims that a substantial likelihood of a miscarriage of justice arose from the prosecutor's closing argument and the cross-examination of certain witnesses. He also claims error arose from the admission of bloodstain evidence, and asks that we exercise our power under G. L. c. 278, § 33E, to grant him a new trial or to reduce the murder verdict against him. We affirm and decline to exercise our power under G. L. c. 278, § 33E.

The evidence in the light most favorable to the Commonwealth, *Commonwealth* v. *Burnett*, 417 Mass. 740, 741 (1994), reveals the following: Roger, Mark, Christopher, and Randy Thompson (all brothers), Jerome and Leroy Simon (also brothers), and the murder victim were members of a musical group.[1] On the evening of August 11, 1995, Roger, Mark, Leroy, Jerome, and the victim were outside a friend's house on Nelson Street in the Dorchester section of Boston, when two people approached them on a motorcycle. Christopher was also nearby. The passenger on the motorcycle pulled out a gun and fired it at the group who immediately dropped to the ground. Mark jumped up and ran away. The shooter pursued Mark, continuing to fire at him. He then came back, shot Jerome, Roger, and the victim while standing over them.

The police arrived on the scene in response to a "911" call that had been placed at 10:05 P.M. The victim died from multiple gunshot wounds, and Jerome and Roger were seriously wounded. Christopher told the responding officers that he recognized the shooter as a man named "Kevin," from Cambridge, who possibly drove a black Acura Legend automobile. Christopher also noted that the shooter was wearing a "green net shirt." At the police station, roughly two hours later, Mark told police that the shooter, whom he knew as Kevin from Cambridge, wore a "green-netted" shirt. On August 15, 1995, while hospitalized, Roger also told police that Kevin was the

---

[1]As many of the individuals share a last name, for clarity, after the initial reference, we will employ only their first names.

shooter and that Kevin wore a green sleeveless shirt that night.[2]

After Mark, Christopher, and Roger identified the defendant's photograph from a photographic array, the police arrested him. The defendant told police that he had been at Wellesley College from 9 P.M. until 10:45 P.M. on the evening of the shooting. The police searched the defendant's house pursuant to a warrant and recovered a green mesh shirt. A criminalist with the Boston police department crime laboratory testified, over objection, that there was a small stain on the shirt which, one year after the shooting, tested positive for the presence of blood, but that the stain was too small to allow its origin to be determined. Sometime later, Jerome also identified the defendant from a photographic array.

At trial, Mark, Christopher, Roger, and Jerome all identified the defendant as the shooter. Two weeks prior to the shooting, an altercation among several members of the victim's group, the defendant, and the defendant's friends occurred at a local nightclub. Every day after this event, the defendant drove his black Acura Legend automobile past Jerome and Leroy's house and on one occasion, the defendant simulated shooting a gun toward Christopher, Roger, and Jerome as he walked by them on his way into a neighborhood store.

The defendant admitted that he was known as Kevin, that he previously lived in Cambridge, and that he drove a black Acura automobile.

1. *Propriety of the prosecutor's closing argument.* The defendant claims that the prosecutor misstated the evidence in her closing argument when she asserted that no unbiased alibi witnesses testified to facts that would have precluded the defendant from being at the scene at 10 P.M., the time of the murder.[3] The defendant also challenges the prosecutor's statement in her closing that only four alibi witnesses placed him in

---

[2]Earlier, at the crime scene, Roger had told a responding officer that he knew the shooter as the "dude from the party."

[3]The defendant claims the following portion of the prosecutor's closing statement was improper:

"Now you heard from witnesses from the defense as well. You heard from quite a number of witnesses who said that they saw the defendant out in Wellesley on August 11, 1995. No one is trying to tell you that the defendant could not have been out in Wellesley on August 11 of 1995. He may very well have been. He may have been out there

Wellesley during the murder. The defendant concedes that counsel did not raise these objections at trial. As this case is before us pursuant to G. L. c. 278, § 33E, we review the prosecution's closing statement to determine whether it created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Lennon*, 399 Mass. 443, 448-449 & n.6 (1987).

"Remarks made during closing arguments are considered in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992),

at 8 o'clock, at 9 o'clock, at 11 o'clock he may have been out there. Maybe he was out there at midnight. But the evidence in this case is that at 10 o'clock he was the cold blooded killer who took [the victim's] young life on Nelson Street.

"At the beginning of this case you were promised that you were going to hear testimony from unbiased witnesses who would tell you that at the time of the crime this defendant was in Wellesley. I suggest to you, ladies and gentlemen, that you heard no such thing. You heard from some witnesses that were not related to the defendant. You heard from two young women, a Tanesha Neves and a Tanya White, who told you that they worked with the program. I think one said she was a teacher's assistant and the other was some type of administrator or room assistant.

"They told you that they saw the defendant there, but they gave you some times. And the times that they gave you did not prevent the defendant from being on Nelson Street at ten o'clock. Tanesha Neves estimated, she said she got up from her seat, went to the ladies' room, saw the defendant at she estimated 8:30 to 8:45 sitting in the chapel. She said that she later saw him at some point during the reception back at the dorm.

"Well according to the woman who runs the program . . . that reception ran until 11:15. The defendant himself told you that his reason for going up to Wellesley in the first place was only to give his cousin a ride. There was no reason that the defendant could not have gone to Wellesley, given his cousin a ride, perhaps even shown his face around a little bit, then left and come back to pick his cousin up. There's nothing in the testimony of those supposedly unbiased witnesses to contradict that.

"And that's the same for, there was a witness Swayne Blackmon who also put the defendant there only at time periods outside the time that would have been necessary for him to be on Nelson Street. In fact the only witnesses you heard from the defense who put the defendant out in Wellesley at the time in question are his three cousins . . . and [a cousin's] friend who testified yesterday, Khali Tabor."

and cases cited. In *Commonwealth* v. *Murchison*, 418 Mass. 58, 59-60 (1994), we noted that a prosecutor may, in summation, argue from the evidence and conclusions fairly inferable from the evidence. We also pointed out that, although it is often difficult to determine the point at which an inference becomes too attenuated, trial counsel enjoy wide latitude in this regard. *Id.*

a. *Testimony of allegedly unbiased witnesses.* The defendant contends that, contrary to the prosecutor's assertion, Tanesha Neves, Khali Tabor, Swayne Blackmon, and Tanya White were unbiased witnesses who placed the defendant in Wellesley at the time of the murder. In reviewing their testimony in light of the standards discussed above, we conclude that the prosecutor's argument was proper.

Tanesha Neves, who had worked with the defendant some years before, testified that she saw the defendant at the reception and then later "outside the hall and it was almost ten [o'clock]." Tanesha also testified that the ceremony ended "around 9, 9:15."

On cross-examination Tanesha testified that she had seen the defendant at about 8:20 P.M., and that she had not seen him again until fifteen to thirty minutes after the ceremony ended. Because of the witness's confusion about the time of the ceremony and her concession on cross-examination, the prosecutor was entitled to interpret her testimony as not placing the defendant in Wellesley at the time of the shootings.

The prosecutor's implicit assumption that Khali Tabor (a friend of the defendant's cousin, Roxanne Grant) was an interested witness was also proper. On cross-examination, the witness testified that she was a close friend of the defendant's cousin, and that she had previously discussed her testimony with her on more than one occasion. From this the prosecutor could fairly infer that she was an interested witness.

Swayne Blackmon, another friend of Roxanne Grant, testified on direct examination that he saw the defendant arrive at the ceremony and that the defendant stayed until it ended at "about 10:30 maybe." However, on cross-examination, he admitted to seeing the defendant only twice, once on his arrival and then afterward at the reception. Again on the basis of his cross-examination, the prosecutor could properly take the position that Blackmon did not place the defendant in Wellesley at the time of the murder.

Contrary to the defendant's argument, Tanya White, a resident

assistant with the Upward Bound program, conceded on cross-examination that she sat several rows in front of the defendant and could not be sure that the defendant was present during the entire ceremony. Her testimony, therefore, was consistent with the prosecutor's closing argument.

b. *Testimony of familial alibi witnesses.* The defendant also claims it was improper for the prosecutor to argue that "the only witnesses . . . who put the defendant out in Wellesley at the time in question are his three cousins . . . and [Khali Tabor] who testified yesterday." The defendant argues that in omitting a fourth cousin, Karesha Kelley, and Karesha's mother from this list, the prosecutor created a substantial likelihood of a miscarriage of justice.

Karesha testified that she saw the defendant at the ceremony and that the ceremony ended at 10:15 P.M. However, on cross-examination she said that the only time she saw the defendant during the ceremony was when she glanced back at him from her seat at around 8:30 P.M. or 8:45 P.M., and that she did not see the defendant again until some point during the reception. The prosecutor was not required to include her as a witness who placed the defendant in Wellesley at the time in question.

Karesha's mother testified that she saw him "some minutes after 10 [P.M.]." Ideally, the prosecutor should have included Karesha's mother as one of the alibi witnesses. However, her inability to recall the precise time that she saw the defendant and her relationship with the defendant makes this omission a comparatively minor one that did not create a substantial likelihood of a miscarriage of justice.

Finally, we note that the judge gave strongly worded instructions on the statements of counsel:

> "I want to emphasize to you again what isn't evidence, in the form of statements of counsel in their openings, statements of counsel in their closings, in which they may have touched upon what they perceive to be the evidence. And if they have said anything and I say anything during these instructions to you, if I touch upon any evidence in the case, if what counsel said or what I say does not coincide with what your recollection of what the evidence was in the case, it's your recollection that controls, not the lawyers and not mine, because you are the sole and exclusive determiners of the facts from the evidence before you."

Even if the prosecutor's closing argument went somewhat beyond the testimony and the permissible inferences, these instructions, coupled with defense counsel's failure to object, the strong identification testimony by witnesses who knew the defendant prior to the crimes, and the jury's opportunity to evaluate witness credibility, lead us to conclude that there was no substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Ruddock, ante* 288, 292 n.3 (1998) ("In deciding, under G. L. c. 278, § 33E, whether an error in a jury instruction created a substantial likelihood of a miscarriage of justice, a new trial is called for unless we are substantially confident that, if the error had not been made, the jury verdict would have been the same"); *Commonwealth* v. *Viriyahiranpaiboon, supra* at 231 (summation remarks considered in context of entire argument, judge's instructions to jury, and evidence at trial).

2. *Cross-examination of alibi witnesses.* The defendant next contends that the prosecutor impeached Tanya White and Tanesha Neves based on their pretrial silence without laying a proper foundation.[4] This objection was not raised at trial. We therefore

---

[4]During cross-examination by the prosecutor, Tanya White testified as follows:

> THE PROSECUTOR: "When were you first contacted to testify in this case?"

> THE WITNESS: "When the lawyer called me."

> THE PROSECUTOR: "When you say the lawyer, that would be [defense counsel], is that right?

> THE WITNESS: "Yes."

> THE PROSECUTOR: "And did you ask [defense counsel] where he got your name?

> THE WITNESS: "No, I didn't."

> THE PROSECUTOR: "When did [defense counsel] first contact you?

> THE WITNESS: "Maybe three, four weeks ago."

During cross-examination by the prosecutor, Tanesha Neves testified as follows:

> THE PROSECUTOR: "[W]hen did anyone first approach you about testifying in this case?"

> THE WITNESS: "A couple of weeks ago."

> THE PROSECUTOR: "So just a couple of weeks ago was the first time that anyone asked you if you recalled seeing [the defendant] at Wellesley that night, is that correct?"

again review to determine whether there was a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Lennon*, 399 Mass. 443, 448-449 & n.6 (1987).

In *Commonwealth* v. *Gregory*, 401 Mass. 437, 444-445 (1988), this court quoted with approval the appropriate foundational guidelines for raising the issue of pretrial silence, as set forth in *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 296-297 (1981):

"[B]efore the Commonwealth [may] question a witness

THE WITNESS: "Mm."

THE PROSECUTOR: "And who was it that asked you that question?"

THE WITNESS: "It was a friend of mine."

THE PROSECUTOR: "Who is the friend?"

THE WITNESS: "Tanya White."

THE PROSECUTOR: "Tanya White. And Tanya White is also here as a witness today, is that correct?"

THE WITNESS: "That is correct."

THE PROSECUTOR: "And would it be fair to say that Tanya White called you and asked you if you recalled seeing [the defendant] that night, is that right?"

THE WITNESS: "Yes."

THE PROSECUTOR: "And did Tanya White tell you that she was going to testify that she saw [the defendant] at Wellesley that particular night?"

THE WITNESS: "Yes."

THE PROSECUTOR: "In fact, you came to court today with Tanya White, is that correct?"

THE WITNESS: "Yes."

THE PROSECUTOR:: "And you've been discussing your observations of [the defendant] at Wellesley with Tanya White, is that fair to say?"

THE WITNESS: "That's fair to say."

THE PROSECUTOR: "When you were asked approximately two weeks ago by defense counsel whether you saw [the defendant] at Wellesley that night, you didn't even have to think about it, is that correct?"

THE WITNESS: "That's correct."

THE PROSECUTOR: "You said instantly [']yes, [the defendant] was there[']; is that right?"

THE WITNESS: "That is correct."

on pretrial silence and thereby implicate that witness as having recently fabricated testimony, the Commonwealth must establish that 'the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, that the witness had reason to make the information available, that he was familiar with the means of reporting it to the proper authorities, and that the defendant or his lawyer, or both, did not ask the witness to refrain from doing so.' "

Ordinarily pretrial silence is raised to imply that the witness has recently fabricated her trial testimony. However, there is a difference between questioning why a witness did not come forward sooner, and giving the jury a basis to find that witnesses had an opportunity to collude. Seen in this light, it was entirely proper for the prosecutor to explore whether, after the witnesses learned that they could be called to testify on the defendant's behalf, they had an opportunity to formulate a common narrative.

Furthermore, the prosecutor never asked why the witnesses had not come forward earlier, nor did she press this point in her closing statement. Apart from Tanesha's testimony regarding her pretrial discussions with Tanya, the prosecutor's questions only brought out when these witnesses were first asked to testify. There was no suggestion that these witnesses should have come forward sooner and, therefore, the questioning was not improper. *Commonwealth* v. *Gagnon*, 408 Mass. 185, 192 (1990) ("the scope of cross-examination, including to what extent the accuracy, veracity, and credibility of a witness may be tested, rests largely in the sound discretion of the judge"). Even if we were to conclude that the questions intruded into the area of pretrial silence, the transgression would not be of sufficient significance to create a substantial likelihood of a miscarriage of justice.

The defendant further complains that the prosecutor improperly questioned Roxanne Grant about why she had not told the grand jury that Khali Tabor was present at the graduation (Roxanne testified at trial that Khali was present). Roxanne's response was that no one had asked her. When the prosecutor asked a follow-up question, the judge interrupted the prosecutor, and said, "Wait just a second. In a grand jury, much like this, people have to be asked a question before they can respond and they must respond responsively." The prosecutor continued

this line of questioning and the judge then sustained defense counsel's objection stating, "The jury will disregard that. She's answered that she was never asked." Jurors are presumed to follow such instructions. *Commonwealth* v. *Helfant*, 398 Mass. 214, 228 (1986), and cases cited. There was no error.

3. *Bloodstain testimony.* The defendant next contends that the judge erred in allowing the Commonwealth to introduce expert testimony regarding a bloodstain found on the green shirt police seized from his apartment. He argues that the stain was too small adequately to establish the age and origin of the blood and therefore, the prejudicial effect of this evidence outweighed its probative value. We have previously disposed of a nearly identical argument adversely to the defendant's claim. See *Commonwealth* v. *Beldotti*, 409 Mass. 553, 561 & n.6 (1991); *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 745 (1990).

4. *Ineffective assistance of counsel.* The defendant next alleges that his trial counsel was ineffective in failing to object to the prosecutor's closing statement and to her impeachment of Tanya and Tanesha. "[I]f a defendant convicted of murder in the first degree is unable to show on his direct appeal that, as to an unpreserved claim of error, there is a substantial likelihood of a miscarriage of justice, he would not prevail by asserting as to the same issue the ineffectiveness of his counsel." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). In light of our above conclusions concerning the closing statement and impeachment challenges, the defendant's claim on this point is unavailing.

5. *General Laws c. 278, § 33E.* We have reviewed the record pursuant to G. L. c. 278, § 33E, and find no basis to afford the defendant relief.

*Judgments affirmed.*