COMMONWEALTH *vs.* WILLIAM LAPAGE.

Suffolk. October 5, 2001. - December 12, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, Instructions to jury, Presumptions and burden of proof. *Malice.*

At a murder trial, the judge erred in instructing the jury in a manner that told the jury that malice was negated by provocation only if provocation was proved beyond a reasonable doubt, and this error, even when reading the instructions as a whole, created a substantial likelihood of a miscarriage of justice, where the judge only once correctly instructed the jury on the Commonwealth's burden of proof on provocation, but did not make it clear to the jury that the corrective instruction carried more weight than the incorrect one, and where the judge later aggravated the error by saying that all the instructions had equal weight. [484-486] CORDY, J., dissenting.

At a murder trial, the judge's instructions to the jury improperly suggested that the Commonwealth did not have to prove an essential element of voluntary manslaughter, namely, an intentional killing; this court concluded that, when viewed in conjunction with the errors in the voluntary manslaughter instruction with regard to the burden of proof on provocation, the judge's instruction potentially deprived the defendant of his mitigating defense, and required a new trial. [486-488] CORDY, J., dissenting.

This court discussed issues that might arise at the retrial of an indictment charging murder in the first degree. [488-489]

INDICTMENT found and returned in the Superior Court Department on March 9, 1995.

The case was tried before *Robert W. Banks*, J., and, upon his retirement, *Wendie I. Gershengorn*, J., declined to address a motion for a new trial, filed October 21, 1999, and instead left the motion to be addressed in the defendant's direct appeal.

*Ruth Greenberg* for the defendant.

*Susanne Levsen Reardon*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree on theories of deliberate

premeditation and extreme atrocity or cruelty. Represented by a new attorney, the defendant filed a motion for a new trial. The judge assigned to the motion (the trial judge having retired) took no action on it, leaving the defendant's claims for us to decide on this direct appeal. See *Commonwealth* v. *Erdely*, 430 Mass. 149, 150 (1999). We conclude that portions of the jury instructions concerning voluntary manslaughter were erroneous and posed a substantial likelihood of a miscarriage of justice. Consequently, we reverse the defendant's conviction of murder in the first degree, set aside the jury verdict, and remand the case for a new trial.

At trial, there was no dispute that the defendant killed the victim. His defense was that he was not guilty of murder because he acted in self-defense. Trial counsel argued to the jury (for their consideration as an alternative verdict) that the defendant was guilty only of voluntary manslaughter because he had acted on reasonable provocation or had used excessive force in self-defense. Trial counsel also urged the jury to consider the effect that drug and alcohol consumption might have had on the defendant. The judge instructed the jury that they could consider the effect, if any, that drug and alcohol consumption might have had on the defendant's ability deliberately to premeditate and to form the requisite intent to kill. Further, as the framework of the case required, the judge instructed the jury on murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty, murder in the second degree, voluntary manslaughter, and involuntary manslaughter.

The evidence, considered for purposes of the issues on this appeal in the light most favorable to the defendant, see *Commonwealth* v. *Carlino*, 429 Mass. 692, 693 (1999), would have warranted the jury in finding the following. On February 24, 1995, after drinking eight or nine beers within three hours, the defendant "got the urge to do some cocaine." He left his apartment and purchased some cocaine and returned home. He divided the crack cocaine into six "hits." Shortly after 11 P.M., the defendant smoked the first "hit." He then called the victim, with whom he had had an eleven-month relationship and with whom he had previously smoked cocaine. After speaking with

the victim, the defendant left one "hit" of cocaine at his apartment and took the remaining four "hits" to the victim's apartment.

At the victim's apartment, the defendant and the victim each smoked two "hits" and drank beer. A little after 1 A.M., on February 25, 1995, the victim told the defendant that she would telephone her dealer to get some more cocaine. When it became apparent that the victim was not going to, the defendant went home. There he smoked his last "hit" of cocaine, and drank another beer. Shortly after 2 A.M., the victim telephoned the defendant, inviting him back to her apartment. He returned and brought a green duffel bag with him. The defendant and the victim drank beer until the defendant got tired. The victim asked the defendant to stay the night, and he did. (The defendant and the victim did not engage in sexual relations.)

When he awoke, as he was getting ready to leave, the defendant recalled that the victim had taken forty-five cents from him the previous night, and asked her to return the money. The victim replied that she did not know where the money was. The defendant complained that every time he visited her, he would discover something missing from his pockets. The defendant again asked for his money back. The victim said that she needed to take a taxicab to her credit union. The defendant told her that he did not think it was "right" for her to take his forty-five cents to "pedal [her] fat ass around in a taxi." In response, the victim hit the defendant hard on the side of his face and his glasses "went flying." The defendant became "pissed . . . off" and punched the victim on the back. A fist-fight ensued. During the fight, the defendant tried to restrain the victim. She bit his left thumb at his knuckle, then ran to the kitchen and grabbed a knife from the counter.

The defendant was aware that the victim could be violent.[1] He pulled out a knife that he carried "for protection" from his pocket. Panicking, because the victim was blocking the only way out of the apartment and because he had a medical condi-

---

[1] On a prior occasion, the victim had cut the defendant's ear with a blow from behind because he would not pay for their taxicab ride.

tion that impaired his mobility,[2] the defendant moved toward the victim and the doorway. They grabbed each other's right hands, which held their knives, and began wrestling across the apartment while "trying to hurt each other."

At one point, the defendant cut the victim's cheek, which "freaked" him, causing him to drop his knife. He yelled, "You're cut, you're cut, drop your knife, drop your knife." The victim did not comply with his request. Each continued to hold onto each other's hand. The knife that the victim held was coming close to the defendant's face. He was in a panic and felt that he was going to die. The defendant noticed a large knife near the sink and grabbed it. The defendant could "actually recall" only stabbing the victim once, stabbing her in the neck. He conceded, however, that he could have stabbed her more than once with the large knife, and more than once with a small knife.[3]

With the large knife in her neck, the victim stopped fighting. The defendant eased her to the floor, then removed the knife. He panicked when he realized what he had done. He rinsed the knives in the kitchen sink and then put them in his bag. There was blood "everywhere," and the defendant was scared and in shock. He was staring at the victim's body when police officers entered the apartment and arrested him. The defendant had several scratches and scrapes on his face and hands that were not present before his altercation with the victim.

1. We need not address all of the defendant's challenges to the jury instructions because we conclude that the errors in the judge's instructions on voluntary manslaughter require reversal. The defendant's trial counsel did not object to the instructions on the grounds the defendant asserts now.[4] We thus review for a substantial likelihood of a miscarriage of justice. See *Com-*

---

[2] The defendant's right hip was held together by surgical screws.

[3] The medical examiner testified that the victim died from multiple stab and incisor wounds.

[4] The lack of an objection is not remarkable. The principal infirmity in the instructions was not clearly identified until *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716 (1998), which was decided after the defendant's trial, although somewhat foreshadowed by dicta in *Commonwealth* v. *Boucher*, 403 Mass. 659, 661 (1989). The deficient instruction that we shall discuss shortly was in common use in the Superior Court at the time of the defendant's trial.

*monwealth* v. *Carlino, supra* at 695-696; *Commonwealth* v. *Rosa,* 422 Mass. 18, 29-30 (1996).

(a) The Commonwealth concedes error in the portion of the judge's instruction on voluntary manslaughter which states that "to prove the defendant guilty of voluntary manslaughter, the Commonwealth must prove . . . beyond a reasonable doubt . . . that the defendant injured [the victim] as a result of sudden combat or in the heat of passion." See *Commonwealth* v. *Acevedo,* 427 Mass. 714, 716 (1998). See also *Commonwealth* v. *Boucher,* 403 Mass. 659, 661 (1989). In the *Acevedo* decision, we concluded that a similar instruction was erroneous because it "incorrectly told the jury that malice is negated by provocation only if provocation is proved beyond a reasonable doubt. The correct rule is that, where the evidence raises the possibility that the defendant may have acted on reasonable provocation, the Commonwealth must prove, and the jury must find, beyond a reasonable doubt that the defendant did not act on reasonable provocation." *Id.* We explained that, "[t]he difference between proof beyond a reasonable doubt that a defendant acted with reasonable provocation and proof beyond a reasonable doubt that a defendant did not act with reasonable provocation is substantial." *Id.* at 717. The Commonwealth claims that this error did not create a substantial likelihood of a miscarriage of justice because the judge's "instructions read as a whole informed the jury that the Commonwealth bore the burden of disproving provocation and self-defense beyond a reasonable doubt." We disagree.

Here, contrary to the Commonwealth's assertion, the judge only once correctly instructed the jury on the Commonwealth's burden of proof on provocation.[5] Although the judge's correct instruction on that subject followed his erroneous instruction, the correct instruction did not make it "clear to the jury" that it "carr[ied] more weight than the . . . incorrect one[]." *Commonwealth* v. *Fickling,* 434 Mass. 9, 20 (2001). Cf. *id.,* quoting *Commonwealth* v. *Acevedo, supra* at 717 (concluding that erroneous instructions were counterbalanced by correct instruc-

---

[5]The judge adequately stated, "If there is evidence of provocation, the Commonwealth has the burden of proving beyond a reasonable doubt that the defendant did not act in the heat of passion."

tions so that we could not conclude that "the center of gravity of the provocation instructions was strongly on the side of misstatement"). The judge neither acknowledged nor pointed out to the jury in any meaningful manner that his first instruction on the issue had been erroneous. Aggravation of the error occurred when the judge told the jury, "You can't accept one premise as opposed to another premise as being a superior instruction, because all of these instructions have equal weight."[6]

The judge's reminder to the jury that "the defendant does not have to prove anything" does not aid the Commonwealth. The judge gave that instruction not in the context of the provocation instruction, but rather, in his instruction concerning self-defense, which he discussed before even mentioning the separate mitigating circumstance of provocation. That the judge gave some correct instructions to the jury on self-defense is not consequential. As noted by the defendant, "[a] jury required to make a consistent whole of inconsistent instructions might reasonably find that the Commonwealth bore the burden of disproving facts mandating acquittal, but once acquittal was not an option the defendant had the burden . . . of proving murder was mitigated [when there is sufficient evidence of provocation] to manslaughter." In addition, the following cases cited by the Commonwealth are distinguishable. See *Commonwealth* v. *Niemic*, 427 Mass. 718, 721-722 (1998) (although judge correctly instructed that Commonwealth bore burden of disproving heat

---

[6]Contrary to the dissent's intimation, we have reviewed the jury instructions in their entirety. That review demonstrates that the judge did not adequately and clearly explain voluntary manslaughter to the jury. In the instructions there are contradictory statements concerning the Commonwealth's burden of proof on provocation, as well as whether an intentional killing constitutes voluntary manslaughter. The dissent reasons that, with respect to the *Acevedo* error, because a correct instruction of the law followed an incorrect instruction, the incorrect instruction was "immediately corrected," and that the Commonwealth's burden of proof on provocation was "unequivocal." *Post* at 491. This is not so. As we previously noted, the judge never acknowledged that his instructions on the issue had been flawed, and, thus, never supplanted the incorrect instruction with a correct one. To the contrary, the judge told the jury that his instructions carried equal weight. Although we, as Justices educated in the law, are able to discern which instruction was correct and which instruction was incorrect, it cannot be said that the jury could have done so on their own.

of passion, after making *Acevedo* error, provocation was not "live" issue in case and judge, apparently, did not instruct jury that all instructions carried equal weight); *Commonwealth* v. *Hung Tan Vo*, 427 Mass. 464, 471-472 (1998) (involving error in instructions on deliberate premeditation); *Commonwealth* v. *Torres*, 420 Mass. 479, 488 n.8 (1995) (incorrect instruction on provocation sandwiched between two correct instructions, and judge emphatically and repeatedly stated that only Commonwealth, and never defendant, bore any burden of proof).

Finally, we reject the Commonwealth's contention, raised for the first time on appeal, that provocation was not a "live" issue at trial. While the defendant's principal defense was self-defense, there was sufficient evidence that obligated the judge to instruct the jury correctly on provocation. For example, there was evidence (which we must accept as true for purposes of this appeal) that the victim was the first to strike, that she previously had been violent toward the defendant, that no avenue of retreat was available to the defendant, and evidence that would permit the jury to find the whole episode stemmed from a volatile, unexpected confrontation. In his closing argument, the defendant's trial counsel argued that, at best, the Commonwealth had proved manslaughter, not murder, because of the evidence of provocation. When weighed with the additional errors in the voluntary manslaughter instruction, which we next discuss, we conclude that there must be a new trial.[7]

(b) On the issue of voluntary manslaughter, the judge instructed the jury that "the factor that distinguishes voluntary manslaughter from murder is not the absence of intent but rather the absence of malice aforethought. That is the absence of a specific intent to kill or the absence of a specific intent to do great bodily harm." Later, after setting forth the elements of voluntary and involuntary manslaughter, the judge stated, "If

---

[7]The Commonwealth also argues that provocation by means of sudden combat and self-defense are virtually indistinguishable. The argument suggests that errors in the provocation instructions are inconsequential, if the defendant claims self-defense as incident to sudden combat. Our law has never considered the two issues as mutually exclusive. In a case like this, the defendant is entitled to correct instructions on both provocation and self-defense, and the jury are to have an opportunity to consider voluntary manslaughter on both theories.

the Commonwealth has failed to prove an unlawful killing, an intentional killing, if they have not proven malice aforethought, you will then consider whether the Commonwealth has proven voluntary manslaughter." These instructions are erroneous and misleading. They improperly suggest that the Commonwealth does not have to prove an essential element of voluntary manslaughter, namely, an intentional killing. *Commonwealth* v. *Whitman*, 430 Mass. 746, 753 (2000), quoting *Commonwealth* v. *Squailia*, 429 Mass. 101, 109 (1999) (voluntary manslaughter is "an *intentional killing*, which is mitigated by extenuating circumstances" [emphasis in original]). When viewed in conjunction with the other errors in the voluntary manslaughter instruction discussed above, the judge's instruction potentially deprived the defendant of his mitigating defense.[8]

Our conclusion is buttressed by the fact that, in response to a question by the jury for redefinition of the elements of murder in the second degree and malice, the judge gave a compounding incorrect instruction on self-defense when, in answer to their question, he told the jury that, if the Commonwealth had not proved the lack of self-defense, they should "then consider whether the Commonwealth has proven [that] the defendant did not act with excessive use of self-defense." The erroneous instructions (i) confused the jury on the role of provocation; (ii) conveyed the wrong burden of proof on key elements of voluntary manslaughter; and (iii) possibly led the jury to think that voluntary manslaughter could be considered as a verdict only if the Commonwealth failed to prove an intentional killing. These errors went directly to the important factor of malice, a matter that the jury's question reflects was troubling to them. Of course, we do not know how the jury resolved the issues. But, in a case where voluntary manslaughter was a viable

[8]The dissent unfairly charges the jury with knowing and understanding legal definitions, such as malice, and dismisses an incorrect instruction as a mere "slip of the tongue." *Post* at 495. The cumulative effect of several errors in the instructions pose a substantial likelihood of a miscarriage of justice. In addition, the "failure of counsel" to have objected to any errors below does not necessarily "strongly suggest[] that it was not of consequence to those who heard it." *Id.* The lack of an objection is, as has been stated, most likely explained by the fact that the *Acevedo* case had not yet been decided. See note 4, *supra.*

defense, we cannot tell whether the jury may have disregarded consideration of manslaughter because of the erroneous instructions and instead opted only to consider the higher verdicts. The jury's question suggests, if nothing else, that they were concerned whether the Commonwealth had proved malice, and they were discussing the law applicable to a verdict less than murder in the first degree. Thus, we cannot fairly say that the errors did not give rise to a substantial likelihood of a miscarriage of justice.

2. We comment briefly on issues that may arise at any retrial.

(a) At trial, the defendant testified that at the time of the killing, although he believed he stabbed the victim repeatedly, he only recalled stabbing the victim once in the neck. He explained that he "was just being carried along." Considering this testimony, the judge did not err in refusing to instruct the jury that "any actions conducted by the defendant after the killing cannot be used in the determination of malice." See *Commonwealth* v. *Rice*, 427 Mass. 203, 210 (1998).

(b) The defendant argues that, "because the police did not inform [him] at the time of his arrest that he could obtain an independent test for the presence of alcohol and drugs in his body, and made no such tests themselves," the judge's refusal to instruct the jury, pursuant to *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980), requires reversal. Trying to circumvent the rule that the decision to give a so-called "*Bowden* instruction" is a matter of discretion for the trial judge, see *Commonwealth* v. *Rivera*, 424 Mass. 266, 274 (1997), cert. denied, 525 U.S. 934 (1998), the defendant essentially argues that no such discretion existed in this case because the police failed to preserve all exculpatory evidence, namely, the drug and alcohol content of the defendant's blood. The argument has no merit. While the prosecution remains obligated to disclose all exculpatory evidence in its possession, it is under no duty to gather evidence that may be potentially helpful to the defense. See *Commonwealth* v. *Neal*, 392 Mass. 1, 8-9 (1984).

(c) The defendant's remaining challenges to the judge's instructions to the jury need not be discussed. We presume that the judge at any retrial will instruct the jury in accordance with

our model jury instructions on homicide. See Model Jury Instructions on Homicide (1999).

3. We reverse the defendant's conviction of murder in the first degree, set aside the jury's verdict, and remand the case to the Superior Court for a new trial.

*So ordered.*

CORDY, J. (dissenting). Because I believe that the instructions given in this case, evaluated as a whole, do not create a substantial likelihood of a miscarriage of justice, I respectfully dissent.

In *Commonwealth* v. *Acevedo*, 427 Mass. 714 (1998) (*Acevedo*), we found that a jury instruction on voluntary manslaughter that repeatedly misstated the burden of proof on provocation was prejudicial error,[1] and reversed the defendant's conviction of murder in the second degree.[2] We did not, however, abandon or alter our long-standing practice of evaluating jury instructions as a whole, when individual portions of those instructions are challenged on appeal.

"We evaluate the instruction as a whole, looking for the interpretation a reasonable juror would place on the judge's words." *Commonwealth* v. *Trapp*, 423 Mass. 356, 361, cert. denied, 519 U.S. 1045 (1996). We do not "scrutiniz[e] bits and pieces removed from their context," *Commonwealth* v. *Niemic*, 427 Mass. 718, 720 (1998) (*Niemic*), quoting *Commonwealth* v.

---

[1]The Appeals Court had affirmed the conviction, *Commonwealth* v. *Acevedo*, 43 Mass. App. Ct. 1109 (1997), applying the substantial risk of a miscarriage of justice standard. On further appellate review, we reversed the denial of the defendant's motion for a new trial, finding that the error in the instruction had been resurrected because the trial judge had addressed it in denying the motion, and therefore the standard should have been prejudicial error. In applying that standard, we reversed the conviction. *Commonwealth* v. *Acevedo*, 427 Mass. 714, 715 (1998).

[2]Our *Acevedo* decision was presaged by *Commonwealth* v. *Boucher*, 403 Mass. 659, 663 (1989), in which we reversed a conviction of murder in the first degree because the judge's instruction on voluntary manslaughter completely failed to tell the jury that, where evidence of provocation was present, the Commonwealth had the burden of proving the absence of adequate provocation beyond a reasonable doubt in order to sustain its burden of proving murder rather than manslaughter.

*Perez,* 390 Mass. 308, 313 (1983), but "rather in the context of the charge as a whole." *Commonwealth* v. *Repoza,* 400 Mass. 516, 519, cert. denied, 484 U.S. 935 (1987). While the defendant may wish to parse the charge and attack it piecemeal, we view it in its entirety because "the adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Sellon,* 380 Mass. 220, 231-232 (1980).

The question here is whether, viewing the charge as a whole, we believe that there is a substantial likelihood that the jury misunderstood the elements of the offenses or concluded that the Commonwealth did not have the burden of proving beyond a reasonable doubt every element of the crime charged, including the burden of disproving adequate provocation in order to sustain a verdict of murder as opposed to manslaughter. Having reviewed the charge, including those portions most troubling to the court, I do not believe that the jury could have so concluded. The jury instructions, while not perfect, fully conveyed the elements of the crime charged and the proper burdens of proof. Any misstatements were inconsequential in the context of the charge as a whole, and did not create a substantial likelihood of a miscarriage of justice.

*The* Acevedo *error.* After instructing the jury on the elements of murder in the first and second degrees, the judge turned to the crime of voluntary manslaughter, properly describing it as "an unlawful intentional killing resulting from a sudden transport of the passions of fear, anger, fright, nervous excitement or heat of blood when there is no time to deliberate [when] such passion or heat of blood is produced by adequate or reasonable provocation." He also properly explained: "If a person kills another in the heat of passion, which is occasioned by adequate and reasonable provocation . . . then even though that person had an intent to kill, the killing is designated manslaughter, not murder, because of the mitigating circumstances. Again the factor that distinguishes voluntary manslaughter from murder is not the absence of intent but rather the absence of malice aforethought."

The judge then proceeded to list the three elements of the crime of voluntary manslaughter that the Commonwealth was required to prove beyond a reasonable doubt, in language which

we disapproved in *Acevedo.* "First, the defendant inflicted an injury upon [the victim] from which she died. Second, that the defendant injured [the victim] as a result of sudden combat or in the heat of passion or using excessive force in self-defense, and third, that the homicide was committed unlawfully without legal excuse or justification."

This introductory instruction was immediately followed by a specific instruction as to how the jury were to consider evidence of provocation and conduct arising in the heat of passion, the presence of which would reduce an unlawful killing from murder to manslaughter. In this context, he specifically and correctly instructed the jury that, "[i]f there is evidence of provocation, the Commonwealth has the burden of proving beyond a reasonable doubt that the defendant did not act in the heat of passion."[3] Hence, the general instruction on the Commonwealth's burden of proving the three listed elements, which as we suggested in *Acevedo* could be interpreted to place the burden on the Commonwealth to prove provocation or heat of passion rather than to disprove it beyond a reasonable doubt, was immediately corrected in the specific instruction about how the jury were to consider evidence of provocation. That the Commonwealth had the burden of disproving provocation beyond a reasonable doubt in order to prove murder rather than voluntary manslaughter was unequivocal. The jury could not have interpreted this instruction to place any burden on the defendant, or to improperly relieve the Commonwealth of its burden. The charge contained no further incorrect instructions on the issue of provocation. In contrast, the charge in *Acevedo* included two further incorrect instructions following an incorrect and a correct instruction on the subject. We applied the "prejudicial error standard" and concluded that "the center of gravity of the provocation instructions was strongly on the side of misstatement." *Id.* at 717.

The Commonwealth relies on our *Niemic* decision to support its contention that the voluntary manslaughter instruction, read as a whole, adequately conveys the proper burden of proof on

---

[3]In *Commonwealth* v. *Niemic*, 427 Mass. 718, 721 (1998), we held this language adequate to convey the Commonwealth's burden of proving the absence of provocation.

the issue of provocation. The court finds *Niemic* not to be help-
ful to the Commonwealth. I disagree. *Niemic* is directly on
point and ought to be dispositive of the issue in this case. In *Ni-
emic*, the trial judge first instructed the jury in the language we
rejected in *Acevedo*, and then instructed them (in virtually
identical language to that used in the present case), that
"[w]here there is evidence of provocation, the Commonwealth
has the burden of proving beyond a reasonable doubt that the
defendant did not act in the heat of passion" and that "for any
killing to be either first- or second-degree murder, it must be an
unlawful killing committed with malice aforethought." *Id.* at
721. There was in *Niemic*, as here, no further elaboration on the
point and no objection to the instruction. The defendant was
similarly convicted of murder in the first degree. In applying
the substantial likelihood of a miscarriage of justice standard,
we held the charge adequate in *Niemic*, and I would so hold
here.[4]

*Intentional killing.* The court identifies what it contends is a
further error with regard to the voluntary manslaughter instruc-
tions bolstering its view that the defendant was deprived of his
mitigating defense. Specifically, the opinion concludes that the
instructions "improperly suggest that the Commonwealth does
not have to prove an essential element of voluntary manslaugh-
ter, namely, an intentional killing." *Ante* at 487. To support this
conclusion, the court points to two portions of the charge. The
first is: "[T]he factor that distinguishes voluntary manslaughter
from murder is not the absence of intent but rather the absence
of malice aforethought. That is the absence of a specific intent
to kill or the absence of a specific intent to do great bodily
harm." *Ante* at 486. The court finds this portion of the charge to
be erroneous or misleading on whether voluntary manslaughter
involves an intentional killing. It is neither when viewed in the
context of the charge as a whole.

First, the judge's instructions on voluntary manslaughter

---

[4]As noted by the court, the principal defense in this case was self-defense.
Consistent with his instruction on provocation, the judge also clearly instructed
the jury that once evidence of self-defense is before them, the Commonwealth
must disprove self-defense beyond a reasonable doubt in order to sustain its
burden of proving murder.

repeatedly emphasized that it is an intentional killing. The judge begins his instruction on voluntary manslaughter by describing it as "an unlawful intentional killing," and later in the instruction distinguishes involuntary manslaughter from voluntary manslaughter by reminding the jury that "[i]nvoluntary manslaughter is *distinguished* from voluntary manslaughter in that involuntary manslaughter does not contain an intent to kill. *Voluntary manslaughter does involve an intent to kill.* In involuntary manslaughter what is involved is . . . conduct rather than an intent to kill. An intent to do something but not to kill." (Emphases added.)

Second, the "misleading" or "erroneous" language noted by the court is neither when viewed in the flow of the instructions as given. The full text of the first two paragraphs of the judge's charge discussing voluntary manslaughter, which contain the complained of language, is as follows:

> "Now, there are two other possible verdicts in this case, and they are the crime of voluntary manslaughter or the crime of involuntary manslaughter. What distinguishes murder from manslaughter is the element of malice. There must be malice in order for there to be murder. If there is no malice, then the jury may consider manslaughter as an alternative verdict. We have two types of manslaughter, voluntary manslaughter and involuntary manslaughter. Voluntary manslaughter is an unlawful intentional killing resulting from a sudden transport of the passions of fear, anger, fright, nervous excitement or heat of blood when there is no time to deliberate with such passion or heat of blood is produced by adequate or reasonable provocation and without malice or upon sudden combat it would have been likely to produce in an ordinary person, an abnormal state of mind and actually did produce such a state of mind in the defendant.

> "The law provides for the crime of manslaughter in recognition of the frailty of human nature. If a person kills another in the heat of passion, which is occasioned by adequate and reasonable provocation, or in sudden combat, then even though that person had an intent to kill, the killing is designated manslaughter, not murder, because of the

mitigating circumstances. Again, the factor that distinguishes voluntary manslaughter from murder is not the absence of intent but rather the absence of malice aforethought. *That is the absence of a specific intent to kill or the absence of a specific intent to do great bodily harm*" (emphasis added).

The italicized language, which the court suggests is misleading or erroneous on whether an essential element of voluntary manslaughter is an intentional killing, merely refers the jurors back to the definition of "malice aforethought" in the context of murder in the second degree that the judge had just provided, i.e., that malice aforethought is a "specific unexcused intent to kill or a specific unexcused intent to do great bodily harm." A reasonable jury would have understood the judge's reference back to that concept, and would not have concluded that voluntary manslaughter was an unintentional killing. I would find that there was no error.

The court, *ante* at 486-487, next points to a statement the judge makes near the end of his instructions as he describes how the jurors should proceed through the various possible verdicts, telling them to look first to murder in the first degree, and, if the elements are not proved, to murder in the second degree, and then to voluntary manslaughter, and involuntary manslaughter. In this context, the judge said:

> "If the Commonwealth has failed to prove an unlawful killing, an intentional killing, if [it has] not proven malice aforethought, you will then consider whether the Commonwealth has proven voluntary manslaughter."

This is clearly an unintended slip of the tongue by the judge. While it is hard to know precisely how the jury would understand this slip in light of the detailed instructions that the judge gave on the crime of voluntary manslaughter — including repeatedly telling them that voluntary manslaughter is an intentional killing done without malice — there are two indications that suggest that it was not likely misunderstood. Right after the judge makes the above slip, he again correctly distinguishes voluntary manslaughter from involuntary manslaughter by telling the jury that, "[i]f the Commonwealth has

failed to prove an intentional killing but [has] proven an assault and battery and an unlawful killing as a result of that, without the intention to kill, then you would be warranted in returning a verdict of guilty of involuntary manslaughter."

Further, defense counsel makes no note of the misstatement just a few moments later when the judge concludes his charge and asks counsel whether they were satisfied. While defense counsel had a number of requests and comments which the judge considered, incorporating at least one suggestion into further instructions to the jury, there was no complaint regarding this slip of the tongue. The failure of counsel to bring this matter to the judge's attention strongly suggests that it was not of consequence to those who heard it and had a very real interest in its correctness. It also underscores the need to restrain ourselves from reading too much into excerpts pointed out and complained of much later in the process by lawyers who were not present when the charge was given, and were not in a position to assess the impact of the over-all charge on the jurors. On review for a substantial likelihood of a miscarriage of justice, I do not see this slip of the tongue coming close to meeting that standard.

Finally, the court points to the judge's response to a jury question asking "what the law states regarding murder in the second degree, and . . . the definition of malice."[5] The judge's response to the jury, while possibly confusing on a subject not asked about (i.e., excessive use of force in self-defense), otherwise clearly, directly, and correctly restates the law on murder in the second degree and malice in the context of murder in the second degree.

The judge instructed that for murder in the second degree, the Commonwealth must prove two elements beyond a reason-

---

[5]The question, when viewed in the context of the ultimate verdict of guilty of murder in the first degree on theories of premeditation and extreme atrocity and cruelty, strongly suggests that the jury was struggling with the difference between the degrees of murder and the element of malice as applied to each. We can fairly conclude that the jury were not struggling with a verdict of manslaughter versus murder in the second degree when they asked this question. It seems that making such commonsense inferences is particularly within our province when we review the record for a substantial likelihood of a miscarriage of justice.

able doubt: that the defendant "unlawfully" killed the victim, and that the killing was "committed with malice aforethought." The judge noted that the case raised the issue whether the killing was excused, or lawful, because the defendant acted in self-defense. On this point, the judge was clear: "The defendant does not bear the burden of proving justification or excuse. Rather, the Commonwealth must prove to you beyond a reasonable doubt that the killing was not the result of the defendant's act of self-defense."[6]

The judge went on to tell the jury that malice for purposes of murder in the second degree is a specific unexcused intent either to kill or to do grievous bodily harm. That "intent" means a person's purpose or objective, and specific intent involves the "act of concentrating or focusing the mind . . . a conscious act with the determination of the mind to do [it] . . . contemplation rather than reflex . . . preced[ing] the act."

I cannot say that these instructions were erroneous, overly confusing, or conveyed the wrong burden of proof on the key elements of any of the possible verdicts. The lack of specific objection from counsel, who. by all appearances seemed attentive to his client's interests, again belies any obvious misapprehension of the correctness of the gravamen of the judge's instructions.[o]

---

[6]The judge also instructed that, in addition to proving that the defendant did not act in self-defense, the Commonwealth bore the burden of proving that the defendant did not use excessive force in self-defense, where the excessive use of force in self-defense would "drop the case to manslaughter." Admittedly, the judge's language on the interplay between self-defense and the "excessive use of self-defense" was inartful, the over-all message, however, was clear. The Commonwealth had the burden of disproving both self-defense and the excessive use of self-defense to sustain a verdict of murder.