COMMONWEALTH *vs.* BRIAN J. SIROIS.

Worcester. December 5, 2001. - October 23, 2002.

Present: MARSHALL, C.J., SPINA, COWIN, & SOSMAN, JJ.

*Practice, Criminal,* Admissions and confessions, Waiver, Instructions to jury, New trial, Assistance of counsel, Capital case. *Evidence,* Admissions and confessions. *Constitutional Law,* Assistance of counsel. *Homicide. Self-Defense.*

The record of a hearing on a motion to suppress evidence supported the judge's conclusions that, although police officers did not provide the defendant with complete Miranda warnings before the defendant made a second statement approximately three hours after an earlier Miranda warning, the officers were under no obligation to suspend questioning and readvise the defendant of his Miranda rights, and that the defendant knowingly and intelligently waived those rights. [850-852]

At a murder trial, the judge's instruction to the jury on voluntary manslaughter, though erroneous, gave the defendant the benefit of an instruction that was not warranted by the evidence, and, therefore, the defendant could not have been prejudiced by any error in that instruction. [852-856]

A trial court judge properly denied, without a hearing, a criminal defendant's motion for a new trial, where the motion and affidavits failed to raise a substantial issue. [856-857]

In a case of murder in the first degree, the defendant did not receive ineffective assistance of counsel, where there was no showing that counsel's strategic decision not to have the defendant testify at a suppression hearing was an error, and where there was no showing that an instruction containing an error of no consequence, to which counsel failed to object, likely influenced the jury's decision. [857-858]

This court declined to exercise its authority in accordance with G. L. c. 278, § 33E, to reduce the jury's verdict of guilty of murder in the first degree or order a new trial, where the judge's instruction on deliberate premeditation clearly conveyed to the jury the requirement that there be an intent to kill, and the judge's erroneous malice instruction thus raised no substantial likelihood of a miscarriage of justice. [858]

INDICTMENT found and returned in the Superior Court Department on November 27, 1995.

A pretrial motion to suppress evidence was heard by *Herbert F. Travers, Jr.,* J., and the case was tried before him; motions

for a new trial and to remand for an evidentiary hearing, filed on April 22, 1999, were heard by *James P. Donohue,* J.

*James M. Doyle* for the defendant.

*Anne S. Kennedy,* Assistant District Attorney, for the Commonwealth.

SOSMAN, J. The defendant was convicted of murder in the first degree on a theory of deliberate premeditation, and his motion for a new trial was denied. On appeal, he argues error in the denial of his motion to suppress his confession to the police, the trial judge's instruction on voluntary manslaughter, and the denial of his motion for a new trial without an evidentiary hearing. He also contends that trial counsel was ineffective. We affirm the conviction and the denial of the defendant's motion for a new trial, and we decline to grant relief under G. L. c. 278, § 33E.

1. *Background.* We recite the facts in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised. On September 4, 1995, the defendant shot his wife three times with a .380 caliber pistol. The couple had been married for twelve years, and lived in a home at 151 Mixter Road in Holden with their three small children. The family had been experiencing considerable financial difficulties; their debts totaled approximately $373,000, and they faced imminent foreclosure on the family home. In addition, the defendant was engaged in an extramarital affair with a life insurance agent he had met the previous winter.

Prior to the shooting, the defendant made extensive notes in his day planner on the subject of "how to disappear and start over again." The plan reflected in those notes included obtaining life insurance in amounts "not to exceed $200,000 each, or it gets too much attention." The defendant and his wife had various meetings with an insurance agent (the same agent with whom the defendant was having an affair) to go over their needs for disability and life insurance. The defendant was in favor of his wife's purchasing additional life insurance. Two months prior to the shooting, the victim purchased a $200,000

life insurance policy, naming the defendant as beneficiary.[1] That policy was delivered on August 29, 1995, one week before the shooting.

The day before the shooting, the defendant staged a break-in at the family's home. The victim reported the break-in to the police, who went to the house that evening to investigate. The defendant showed police a back window where he claimed intruders had pried off a screen and forced open the window to enter the house. Police, however, saw no indication of forced entry; the screen was only slightly bent, the window showed no signs of having been forced open, and in the lower right corner of the window, they found an intact spider web. The defendant reported that some computer equipment and a small television had been stolen. The defendant also showed police a computer processing unit and stereo equipment that he claimed to have found in the living room "packaged" by the intruders, ostensibly for later retrieval.

Early in the afternoon of the next day, Labor Day, September 4, 1995, the defendant and his three children headed out of the house to the family car parked in the driveway. The plan was to take the children to the Spencer Fair. The defendant told the children that their mother was going to stay home to "guard the house." After the children were in the car, with seat buckles fastened and playing a game, the defendant went back toward the house, as if he had forgotten something. Once inside the house, the defendant fired three shots from his pistol into the head and neck of his wife. The victim had a defensive contact wound to her right hand, indicating that she had made a futile attempt to ward off the first shot as the gun was pressed against her hand. That shot went through the victim's hand and penetrated her left nostril, suggesting that her hand had been held up in front of her face. Another shot penetrated her left cheek. Another wound to the back of the neck suggested that the third and final shot was fired while the victim lay face down on the floor.

---

[1]The insurance agent had recommended that the wife obtain a $300,000 policy. The reduction in benefits to $200,000 was consistent with the defendant's notation that anything in excess of $200,000 would "get[] too much attention."

The defendant then left the house carrying a camera that he had not had with him when he went in, and drove off with the children, proceeding with his plan to take them to the Spencer Fair. On the way to the fair, the defendant stopped briefly at his vacuum cleaner repair shop in East Brookfield. While there, he hid the .380 caliber pistol in a back room behind some hoses and a box.[2]

The defendant and his children then spent the afternoon at the Spencer Fair, where the children rode ponies and elephants and had their photographs taken. During the several hours they were there, the children observed nothing out of the ordinary in their father's demeanor, reporting that he "seem[ed] to be having fun." At one point, when the children wanted to go for a ride on the Ferris wheel, the defendant told them they could go on the Ferris wheel with their mother "another time." While at the fair, the defendant purchased T-shirts for himself and his children. During a visit to the first aid station for a minor cut to his daughter's finger, the defendant put on one of the new T-shirts, and discarded the shirt he had worn during the shooting. The defendant telephoned his house while at the fair and left a message on the answering machine, ostensibly for his wife, saying that he would get dinner on the way home.

The defendant and his children left the fair in the late afternoon and drove to the Black and White Restaurant in Spencer. On the way to the restaurant, he told the children that he was going to call a neighbor to have her look in on their mother. At the restaurant, the defendant again telephoned his house and left another message on the answering machine. He then called a neighbor and asked her to check on his wife.[3] The neighbor drove over to the defendant's house and, seeing no car in the driveway and the house doors closed, called the defendant

---

[2] Two witnesses testified that the defendant normally kept that weapon under a counter at his shop to protect him from robbery.

[3] In his later confession, the defendant explained that the purpose of his calls and messages was to "further strengthen the illusion that [he] was not involved in [his] wife's death." He also explained that he wanted the neighbor, a nurse, to be the one to discover his wife's body because she "could deal with it better," and that he had hoped to "strengthen [his] alibi" by not being in the vicinity when the victim was found.

at the restaurant and told him that she assumed his wife was either out driving or walking with friends.

The defendant then drove home with the children, becoming noticeably "red" and "sweaty" during the drive. After parking the car in the driveway, the defendant went into the house ahead of the children, calling back out to them to get back into the car, and then yelled at them to go to the neighbor's house. The children, aware of the earlier claimed break-in, assumed that their father's distress and the order to go next door meant that there were "robbers in [their] house." The defendant called the Holden police at approximately 5:30 P.M. and in an excited voice reported that his wife was down on the floor and could not get up. A police officer arrived shortly thereafter, where he found the defendant sitting on the stairs leading into the house, hunched over the telephone and sobbing. The defendant directed the officer into the house, where the officer found the victim lying dead on the floor.

Detective Albert Bourget arrived at the scene at approximately 6 P.M. and advised the defendant of his Miranda rights. The defendant acknowledged those rights, and told Bourget that he wanted to work with the police as long as necessary to find the person who killed his wife. At approximately 8 P.M., he voluntarily accompanied the detective to the Holden police station, where he made two statements to police, discussed in greater detail below. In a statement made during the first interview, held on the night of September 4, the defendant denied any involvement in the killing of his wife. However, at a second interview with police conducted in the early-morning hours of September 5, the defendant gave a statement in which he admitted his involvement in the killing, but claimed that it had happened after he saw his wife approach him with a gun in her hand.

As part of their investigation, the police recovered the pistol that the defendant had hidden in the back of his shop. A ballistics expert confirmed that that pistol was the weapon that had fired the fatal shots. The police also found computer equipment, a small television (the same one that the defendant had reported as stolen in the previous day's alleged break-in), and the victim's pocketbook in the trunk of the defendant's car. Finally,

the police recovered the defendant's shirt from the first aid station at the fair grounds, and found blood inside the right pocket.

2. *Motion to suppress.* Before trial, the defendant moved to suppress both his statements to the police. As to the second statement (in which he had confessed to the shooting), the defendant argued that the police failed to readvise him of his rights at the start of that second interview. The judge denied the defendant's motion, and the Commonwealth introduced both statements at trial. On appeal, the defendant does not challenge the admissibility of the first statement, but contends that his waiver with respect to the second, inculpatory statement was invalid because he should have received a "fresh administration" of Miranda warnings during that second interview when it became distinctly confrontational.[4]

The judge found that police advised the defendant of his Miranda rights three times over the course of the evening: once at roughly 6 P.M., when Bourget spoke with the defendant at the scene; again at approximately 9 P.M., just prior to the defendant's first statement; and again at approximately 2 A.M., when the defendant agreed to give police his clothes and a hair sample for testing. On each occasion, the defendant acknowledged the warnings and waived his Miranda rights. In addition, the defendant signed two Miranda waiver forms in connection with his first statement, and two search consent forms that contained the equivalent of the Miranda warnings.

Prior to the second interview, which began at approximately 4:45 A.M., police did not readvise the defendant of the entirety of his Miranda rights, but did ask the defendant "if he recalled the rights" that had been read to him earlier and whether he understood that those rights "still apply." The defendant replied that he remembered those rights and confirmed his understand-

---

[4]This argument on appeal varies slightly from the theory pressed below, where the defendant argued that the police improperly *commenced* the second interview without readvising him of his rights. He now contends that events *during* the second interview were what triggered the obligation to readvise him of his rights. A claim of unpreserved error is reviewed under the standard of a substantial likelihood of a miscarriage of justice. See *Commonwealth v. Vinnie*, 428 Mass. 161, 163-164, cert. denied, 525 U.S. 1007 (1998). Because we find no error, it is of no consequence whether we treat the claim as preserved or unpreserved.

ing that they continued to apply. During that interview, the defendant broke down and cried, admitted shooting his wife, and then agreed to give a detailed statement. The judge concluded that the defendant was not in custody at the times he made the two statements,[5] and that, even if he had been in custody, the defendant was adequately advised of his Miranda rights and voluntarily waived those rights.[6]

Miranda warnings are required only when an interrogation is custodial in nature. See *Commonwealth* v. *Jung*, 420 Mass. 675, 688 (1995), and cases cited. The defendant acknowledges that he was not in custody during his initial interrogation by the police at the station, but contends that the interrogation became custodial during the second interview when the police told the defendant that they believed he was involved in his wife's killing. We need not address whether the defendant was in police custody at the precise time of the second statement because, even assuming that the interrogation was custodial, the administration of Miranda warnings here met the requirements for such an interrogation. See *Commonwealth* v. *Silanskas*, 433 Mass. 678, 687-688 (2001).

"Miranda warnings, once given, are not to be accorded unlimited efficacy or perpetuity." *Commonwealth* v. *Cruz*, 373 Mass. 676, 687 (1977), quoting *United States* v. *Hopkins*, 433 F.2d 1041, 1045 (5th Cir. 1970). "Generally, where there has been a significant lapse of time between initial Miranda warnings and inculpatory statements, 'the ultimate question is: Did the defendant, with a full knowledge of his legal rights, know-

---

[5]From the outset of his encounter with the police that evening, the defendant repeatedly emphasized his desire to cooperate in any way that would help the police find his wife's killer, and even refused to leave the Holden police station when police told him he was free to go.

[6]The defendant's affidavit in support of his motion to suppress claimed that he suffered from debilitating pain as a result of a recent automobile accident and that, as a result of his physical and mental condition, he did not appreciate the import of the Miranda warnings. Although the defendant did not testify at the suppression hearing, he presented medical records pertaining to his treatment in the wake of the accident, along with the testimony of two witnesses who had observed the defendant's condition and heard his complaints in the time period between the automobile accident and the shooting. The judge did not credit the defendant's complaints concerning his mental and physical condition, and characterized them as either "untrue" or at least "grossly exaggerated."

ingly and intentionally relinquish them?' " *Commonwealth* v. *Silanskas, supra* at 687, quoting *Commonwealth* v. *Cruz, supra* at 687. The lapse of time between the last warning and the defendant's second statement, about two and one-half to three hours, was not "significant," and renewed Miranda warnings have not been required in cases presenting substantially longer intervals of time between the administration of warnings and the resumption of interrogation. See *Commonwealth* v. *Silanskas, supra* at 687, and cases cited. Moreover, although the police did not provide the defendant with complete Miranda warnings before the second interview, they did confirm that the defendant remembered being advised of those rights and understood that those rights "still appl[ied]." In these circumstances, the officers were under no obligation to suspend questioning and readvise the defendant of his Miranda rights yet again when the defendant broke down during that second interview. "[T]here is no requirement that an accused be continually reminded of his rights once he has intelligently waived them." *Commonwealth* v. *Mello,* 420 Mass. 375, 385-386 (1995), quoting *Biddy* v. *Diamond,* 516 F.2d 118, 122 (5th Cir. 1975), cert. denied, 425 U.S. 950 (1976). We are satisfied that the defendant knowingly and intelligently waived those rights. There was no error.

3. *Jury instructions.* The defendant argues that the judge gave an erroneous instruction on voluntary manslaughter. At the point in his instructions where he defined the crime of voluntary manslaughter, the judge erroneously stated that one of the "elements" the Commonwealth must prove beyond a reasonable doubt was that the defendant killed the victim "in the heat of passion." In order to convict a defendant of murder, "[t]he correct rule is that, where the evidence raises the possibility that the defendant may have acted on reasonable provocation, the Commonwealth must prove, and the jury must find, beyond a reasonable doubt that the defendant did not act on reasonable provocation," and the instruction given here erroneously told the jury that it takes positive proof of "provocation" to reduce the crime from murder to manslaughter. *Commonwealth* v. *Ace-*

*vedo*, 427 Mass. 714, 716 (1998) (*Acevedo*).[7] Because the defendant did not object to the instruction at trial, we review whether this error gave rise to a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Niemic*, 427 Mass. 718, 720 (1998). There is no such likelihood of a miscarriage of justice here, as the evidence did not warrant a manslaughter instruction premised on provocation.[8]

"If any view of the evidence in a case would permit a verdict of manslaughter rather than murder, a manslaughter charge should be given." *Commonwealth* v. *Brooks*, 422 Mass. 574, 578 (1996). In assessing whether a voluntary manslaughter instruction was warranted, we therefore consider the evidence in the light most favorable to the defendant. *Commonwealth* v. *Groome*, 435 Mass. 201, 220 (2001). The defendant requested voluntary manslaughter instructions under theories of excessive use of force in self-defense and "reasonable provocation upon sudden combat." The only evidence to support these theories was the defendant's statement (introduced by the Commonwealth during its case-in-chief), in which the defendant alleged that his wife had pointed a pistol at him, that he had grabbed for the weapon, and that he had then heard three shots fired.[9] The defendant's theory at trial was that he had grabbed for the gun in self-defense, and that he had no intent to shoot

---

[7]The defendant's trial occurred almost two years before this court's decision in *Commonwealth* v. *Acevedo*, 427 Mass. 714 (1998) (*Acevedo*).

[8]Because of our assessment that voluntary manslaughter premised on provocation was not raised by the evidence, we need not parse the remainder of the judge's instructions to assess whether other correct portions of the instructions sufficed to avoid any substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Fickling*, 434 Mass. 9, 18-20 (2001); *Commonwealth* v. *Torres*, 420 Mass. 479, 488-491 (1995). But see *Commonwealth* v. *Lapage*, 435 Mass. 480, 484-486 (2001).

[9]The statement contained the following description of the shooting: "I was upstairs and gave Shirley a kiss goodbye, she patted me on the butt. As I was leaving the kitchen to go out, Shirley called my name, loudly. As I turned around, the curtain over the bottom of the stairway was flung back and I saw Shirley advancing towards me. I saw a pistol in her right hand and a black item, that may have been the holster, was in her left hand. The pistol was pointed in a downward position, but it was coming up towards me, like a draw. I grabbed it with one hand and twisted, hearing something snap. The next thing I know I heard three (3) bangs or loud noises. The pistol was now in my hand and all I could think of was getting out of there and going with

his wife when the gun went off.[10] To the extent that the evidence may have supported theories of self-defense, the instructions on self-defense were correct, and the defendant does not contend otherwise. Similarly, as to the use of excessive force in self-defense, the judge's instruction on that theory of manslaughter was also correct.[11] The issue then is whether there was evidence of a killing in the heat of passion, distinct from the manslaughter theory already encompassed in the claim of excessive use of force in self-defense.

Voluntary manslaughter is a "killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Commonwealth* v. *Berry*, 431 Mass. 326, 334 (2000), quoting *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980). To warrant an instruction on a provocation theory of manslaughter, there must be not only evidence that would warrant a reasonable doubt that there was some provocation that would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, but also evidence that what happened actually did produce such a state of mind in the defendant. See *Commonwealth* v. *Little*, 431 Mass. 782, 786 (2000), quoting *Commonwealth* v. *Berry*, *supra*; Model Jury Instructions on Homicide at 28 (1999).

The defendant's statement contains no indication that the victim's arguably provocative act of approaching him with a gun in her hand actually created in the defendant "such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint." *Commonwealth* v. *Little, supra,* quoting *Commonwealth* v. *Berry, supra.*

the kids to have fun. I didn't know what to do, so I went out to the kids and drove away."

[10]The defendant also presented evidence pertaining to his physical and mental disabilities following the earlier automobile accident. As requested by the defendant, the judge instructed on the issue of diminished capacity, with regard to its potential impact on both deliberate premeditation and malice. The defendant does not contend that there was any error in the instructions on diminished capacity.

[11]The judge also explained that, on the issue of self-defense, the jury "may give due regard to the infirmity of human impulses and passions in considering the reasonableness of the defendant's conduct."

Indeed, the defendant's statement says nothing about any emotional reaction whatsoever to the alleged appearance of the victim with a gun, but instead professes complete ignorance of what happened. Moreover, the evidence was that, immediately after this shooting (however it had occurred), the defendant walked back out to the car and drove off to the fair with his children, appearing and behaving perfectly normally and not displaying even the slightest degree of "passion, anger, fear, fright, or nervous excitement." *Commonwealth* v. *Little, supra.* The defendant's theory was not that he had intentionally killed his wife while under the sway of some reasonable provocation, but rather that he had not acted with any intent whatsoever (let alone with any deliberate premeditation). Defense counsel's closing argument made no reference to the defendant's acting under the sway of emotion, asking the jury instead to infer that the gun went off unintentionally during a defensive struggle over the weapon. See *Commonwealth* v. *Vinton*, 432 Mass. 180, 189 (2000) (where defendant claimed self-defense but "denied being in a rage or having any desire to 'get back at' the victim," theory was premised on "calculus of survival, not any blindness of heat of passion on reasonable provocation"); *Commonwealth* v. *Niemic*, 427 Mass. 718, 721-722 & n.1 (1998) (provocation not "live" issue where theory at trial focused on self-defense). Thus, while the defendant's statement warranted an instruction on self-defense and excessive use of force in self-defense, the evidence did not warrant a further manslaughter instruction on a theory of killing while in the heat of passion.[12] The judge's instruction on provocation gave the defendant the benefit of an instruction that was not warranted by the evidence, and he

---

[12]We recently noted that self-defense and provocation incident to sudden combat are not "mutually exclusive" theories, and, therefore, that correct instructions on self-defense and excessive use of force in self-defense do not cure an erroneous instruction on provocation. See *Commonwealth* v. *Lapage*, 435 Mass. 480, 486 n.7 (2001). While the theories are not mutually exclusive, there must nevertheless be evidence to support a particular theory of manslaughter before an instruction on that theory is warranted. Nothing in *Commonwealth* v. *Lapage, supra*, suggests that the theory of self-defense, by itself, automatically incorporates a theory of provocation. See *Commonwealth* v. *Vinton*, 432 Mass. 180, 189 (2000). Here, while the defendant's statement made out the bare outlines of self-defense and excessive use of force in self-defense, the statement provided no evidence of the defendant's emotional reaction to the alleged confrontation, and hence no evidence sufficient to raise

could not have been prejudiced by any error in that instruction. See *Commonwealth v. Simpson*, 434 Mass. 570, 590 (2001).[13]

4. *Motion for a new trial.* Represented by new counsel, the defendant moved for a new trial, and now claims that the motion judge abused his discretion by refusing to hold an evidentiary hearing before denying the motion. A judge may rule on the basis of the facts alleged in the affidavits without an evidentiary hearing if the motion and affidavits raise no substantial issue. Mass. R. Crim. P. 30 (c) (3), 378 Mass. 900 (1979). "Whether a substantial issue has been raised depends on the seriousness of the issue and the adequacy of the defendant's showing . . . and the decision to hold an evidentiary hearing on a motion for a new trial is committed to the sound discretion of the trial judge . . . to which we give substantial deference" (citations omitted). *Commonwealth v. Sullivan*, 435 Mass. 722, 733 (2002).

In an affidavit submitted with the motion, the defendant claimed that trial counsel failed to communicate adequately with him prior to the suppression hearing, and that this failure prevented the defendant from testifying that he did not knowingly and intelligently waive his Miranda rights prior to making

---

the separate but related theory of a killing committed while in the heat of passion.

[13]We also note that the Commonwealth's theory on deliberate premeditation was not premised on some brief reflection by the defendant at the time of the shooting, but was instead presented as a killing that had been premeditated for a period of weeks (or even months). Because deliberate premeditation can occur in a matter of seconds, a finding of deliberate premeditation is not necessarily inconsistent with a theory of provocation leading to that deliberately premeditated killing. See *Commonwealth v. Boucher*, 403 Mass. 659, 662-663 (1989) ("one who acts on reasonable provocation could still deliberately premeditate his intention to kill"). Here, however, the theory of deliberate premeditation presented by the Commonwealth was not one that could coexist with the defendant's theory of sudden provocation, and the jury's verdict of deliberately premeditated murder indicates that they had credited the evidence of the defendant's lengthy and elaborate planning and had rejected any theory that the shooting was the product of some spontaneous reaction to seeing his wife with a gun in her hand. See *Commonwealth v. Vinton, supra* at 189-190 (where Commonwealth's theory of deliberate premeditation premised on defendant's return to scene of earlier concluded altercation, conviction on theory of deliberate premeditation meant that jury rejected defendant's theory that he had been provoked and stabbed victim during initial altercation; flawed provocation instruction therefore did not create substantial likelihood of miscarriage of justice).

the second statement. In response, the Commonwealth submitted the affidavit of trial counsel, who vigorously refuted this claim and explained that the defendant agreed that he would not testify at the suppression hearing for tactical reasons. The judge discredited the defendant's affidavit as untrustworthy, a determination well within his discretion. See *Commonwealth* v. *Lopez*, 426 Mass. 657, 663 (1998), citing *Commonwealth* v. *Stewart*, 383 Mass. 253, 260 (1981). There was no requirement that the judge hold an evidentiary hearing.

5. *Ineffective assistance of trial counsel.* The defendant contends that he received ineffective assistance of trial counsel because his attorney failed to present the defendant's testimony at the suppression hearing, and because the attorney failed to object to the *Acevedo* error in the jury instructions. On a claim of ineffective assistance of counsel in a case of murder in the first degree, the defendant must show that there was an error in the trial and that the error likely influenced the jury's decision. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

We see no error in counsel's strategic decision not to have the defendant testify at the suppression hearing. "An attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made." *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998), and cases cited. Wishing to keep open the possibility of having the defendant testify at trial,[14] there were obvious strategic concerns at stake in putting the defendant on the stand and exposing him to cross-examination at the suppression hearing (as spelled out in counsel's affidavit).[15] At the suppression hearing, defense counsel presented medical records and testimony from two more objective witnesses (a neighbor and the victim's mother) pertaining to observations of the defendant's allegedly incapacitated condition. It was not "manifestly unreasonable"

[14]At the close of the evidence, defense counsel placed on the record an extended colloquy with the defendant in which the defendant ratified the tactical decision not to testify at trial, thus avoiding exposure to cross-examination. That colloquy makes clear that the decision whether to testify was still under active consideration and discussion until the very end of the trial.

[15]Defense counsel's affidavit also specifies that he discussed this issue with the defendant on many occasions, and that the defendant concurred with the recommendation that he not testify at the hearing on his motion to suppress.

to decide to rely on that evidence at the motion to suppress hearing rather than put the defendant on the stand. *Id.*

With respect to the failure to object to the *Acevedo* error, we have already determined that the evidence did not warrant an instruction on reasonable provocation, and the error in that instruction was therefore of no consequence.[16]

6. *General Laws c. 278, § 33E.* We have reviewed the entire record as required by G. L. c. 278, § 33E. We note that the judge instructed the jury on all three prongs of malice, and that only the first prong of malice can support a conviction of deliberately premeditated murder. See *Commonwealth* v. *Simpson,* 434 Mass. 570, 588 (2001). However, the judge's instruction on deliberate premeditation clearly conveyed to the jury the requirement that there be an intent to kill, and the erroneous malice instruction thus raises no substantial likelihood of a miscarriage of justice. See *id.* at 588 & n.13; *Commonwealth* v. *Squailia,* 429 Mass. 101, 107 (1999); *Commonwealth* v. *Jenks,* 426 Mass. 582, 585 (1998). We decline to exercise our authority to reduce the jury's verdict or order a new trial.

> *Judgment affirmed.*
>
> *Order denying motion for a new trial affirmed.*

---

[16]That trial counsel incorrectly believed that the defendant's statement alone would support such a theory does not give rise to a claim of ineffective assistance of counsel. In order to establish the factual predicate for a theory of provocation, the defendant would have had to testify at trial, thereby exposing himself to substantial attack on cross-examination on a multitude of issues that were very difficult for the defense. The strategic concerns surrounding the defendant's decision whether to testify were enormous, and counsel's review of those considerations with the defendant is amply reflected in the record. Just as the defendant opted not to testify and to rely exclusively on his bare bones statement with respect to the theories of self-defense and excessive use of force in self-defense, it was an eminently reasonable tactical decision not to testify in support of the closely related (albeit ultimately inadequate) theory of provocation.