Brassard, J.
On March 26, 2001, after a two-week jury trial, the defendant Craig W. Conkey (“Conkey”) was found guilty of first-degree murder, armed burglary, and armed assault in a dwelling stemming from the beating and strangulation death of Mary Lou Sale (“Sale”) on December 3-4, 1994. This court (Brassard, J.) sentenced Conkey to a prison term of life without parole on the murder conviction, and concurrent terms of eighteen to twenty years on the other two convictions. This matter is before the court on Conkey’s motion for post-conviction relief, in which he requests that this court: (1) grant him funds, pursuant to Mass.R.Crim.P. 30(c)(5), to hire forensic experts to conduct DNA and other testing on two previously-untested pieces of evidence currently in the Commonwealth’s possession; (2) grant him a new trial pursuant to Mass.RCrimP. 30(b); and (3) in the alternative, set aside the verdict pursuant to *692 Mass.R.Crim.P. 25(b)(2). For the reasons set forth below, Conkey’s motion is DENIED.
I. BACKGROUND '
In September 1994, Mary Lou Sale, a 49-year-old woman who worked as an accountant, relocated from California to Massachusetts. Sale lived alone in a rented two-story house located at 915 Massachusetts Avenue in Lexington. There was evidence that on the evening of Saturday, December 3, 1994, Sale went up to her second-floor bedroom, put on her pajamas, got into bed, and read until she fell asleep. Sale’s neighbors saw lights on in her house until approximately 9:30 PM. One of Sale’s neighbors was awakened by the sound of breaking glass some time between 11:30 PM and 12:15 AM. After Sale did not show up for work on the following Monday or Tuesday, her boss called the police.
When the police arrived at Sale’s house on the morning of Tuesday, December 6, they noticed that a pane of glass on the back door had been shattered. The police found Sale’s body lying face up on her bedroom floor in a pool of dried blood. There were a number of lacerations on Sale’s head, and a nylon stocking was tightly knotted around her neck. Sale’s body was clothed only in a pajama top that had been ripped open. An autopsy revealed that the cause of Sale’s death was ligature strangulation and blunt force trauma to the head. There was no forensic evidence to suggest that Sale had been sexually assaulted. Sale had been dead for approximately two to three days as of Tuesday, December 6th.
Three human, Caucasian head hairs were recovered from Sale’s pajama top. Two of the hairs were brown and had been naturally shed, while one hair was gray and had been forcibly removed. FBI Special Agent Christopher Hopkins testified that a “forcibly removed” hair is a hair that is not ready to be naturally shed, since it is still actively growing in the scalp. Special Agent Hopkins also testified that there are a number of ways that a hair could be forcibly removed. Special Agent Hopkins acknowledged that he could not ascertain: (1) the amount of force used to remove the hair; (2) whether the hair had been transferred directly or indirectly to Sale’s pajama top; or (3) when the hair had been removed.
Many of Sale’s personal belongings, such as her purse, credit cards, wallet, and certain items of jewelry, were missing from her house and never recovered. The drawers of a small vanity located next to Sale’s bed had been opened, and two rings were lying on the floor. The sliding door to the downstairs closet, where Sale kept her purse, was partially open. The middle drawer of a seven-drawer “highboy” dresser located opposite Sale’s bed was also partially open. This drawer contained underwear, pantyhose, and nylon stockings similar to the nylon stocking used to strangle Sale.
Sale’s landlord, Dr. Laing, was the initial target of the police investigation into Sale’s death. Dr. Laing, who was sixty years old and had reddish orange hair at the time of Sale’s death, lived down the street from Sale at 1024 Massachusetts Avenue. The police interviewed Dr. Laing on December 6, 1994. Dr. Laing told the police that he thought Sale was attractive, and that he had asked her out to dinner a couple of times. Sale declined these invitations from Dr. Laing. Dr. Laing went on to tell the police that on the evening of Saturday, December 3, 1994, he attended a holiday party with his fiancee, Mary McAlaiy (“McAlaiy”). Dr. Laing and McAlary returned to Dr. Laing’s house in Lexington after the party and went to bed around midnight. Dr. Laing told the police that he woke up between 7:00 AM and 8:30 AM the following morning, and that McAlaiy woke up at approximately 10:00 AM.
Dr. Laing made some bizarre and potentially incriminating statements to the police during the course of his interview. Dr. Laing stated that he had been inside Sale’s bedroom during the last week in November 1994 to investigate a water leak at Sale’s request, and that during the course of this visit he opened the middle drawer of the highboy dresser in an effort to move the dresser. The police asked Dr. Laing if there were bras, panties, and nylons in the drawer, and he said that there were. Although the circumstances of Sale’s death had not yet been revealed to the public, Dr. Laing then asked the police, “[w]hy, was she strangled with a nylon stocking?” Dr. Laing also provided the police with conflicting statements with regard to when he had been at Sale’s residence between Friday, December 2 and Tuesday, December 6.
The police searched Dr. Laing’s house pursuant to a search warrant the day after the interview. They found a set of keys to Sale’s house, as well as another set of keys to Dr. Laing’s other rental property, in the pocket of a pair of pants owned by Dr. Laing. The following day, Dr. Laing provided the police with a four-page handwritten note from Sale, dated November 28, 1994, regarding the repairs that Sale had wanted Dr. Laing to perform. There was a small, dark red spot on one page of the note, and initial forensic testing revealed that the substance on the note was blood.
As part of an ongoing neighborhood canvass, the police interviewed Conkey on December 10th and December 17th at the McDonald’s Restaurant in Bed-ford, where he had been working for two years. Conkey told the police that he had never seen Sale around the neighborhood, that he had never been to her home, and that he did not have any information regarding her death. On December 21,1994, the police obtained a faxed copy of Conkey’s fingerprint card, and on December 29, 1994, the police matched a latent fingerprint found on the inside of Sale’s bedroom door to Conkey’s left ring finger.
*693 On the evening of December 29, 1994 State Police Trooper Peter Sennott and Lieutenant Steven Corr went to speak with Conkey at his apartment on 855 Massachusetts Avenue in Lexington. Conkey reiterated that he had never met Sale, and he then stated, “I was never in that house, a hundred percent never, I’m sure.” Conkey told the police that he left work early on Saturday, December 3rd because he had injured his hip the day before, and that on the evening of the 3rd he went for a walk in the neighborhood, but that he did not go near Sale’s house. Trooper Sennot then asked Conkey, “Craig, what would you do if we told you that we had something of yours that was found inside [Sale’s house], it’s got you all over it, it’s just like a driver’s license.”
Conkey again denied that he had been inside Sale’s house, and he asked to speak with his landlord. The police overheard Conkey tell his landlord, “They think I did it, I don’t want to tell them that because I’ll get involved. I was outside her home, I heard a scream, I went in, I don’t want to tell them that because I’ll get involved.” After Conkey’s landlord left the apartment, Lieutenant Corr asked Conkey why he had been lying to the police. Conkey told the police that he didn’t want to get involved, and then he provided his revised version of the events of December 3, 1994.
Conkey told the police that he had gone out for a walk some time between 9:00 PM and midnight on the evening of Saturday, December 3, 1994. While he was smoking a cigarette in the wooded area behind Sale’s house, Conkey heard a scream coming from the second-floor window of the house. According to Conkey, the scream lasted for several seconds. Conkey walked to the back door of the house, saw a broken pane of glass, unlocked the door, and went inside. After Con-key walked up the stairs to the second-floor landing, he looked to his right and saw Sale’s body lying on the floor. Conkey approached Sale’s body and placed his hand on her neck to check for a pulse. He picked up the phone in Sale’s bedroom to call the police, but then he hung up because he did not want to get involved. After he told the police his version of events, Conkey agreed to show the officers the route he took on the night of December 3, 1994. Subsequent to the walk-through, Conkey was placed under arrest.
At trial, the Commonwealth presented the testimony of Conkey’s supervisor at the McDonald’s Restaurant in Bedford. Conkey’s supervisor testified that on Saturday, December 3rd, Conkey left work around 11:00 AM, approximately IV2 hours prior to the end of his scheduled shift. Conkey called the restaurant at 10:41 PM that evening and said that he had fallen and hurt himself, and that he would not be coming into work the following day. Records from the restaurant indicated that Conkey did not show up for work on Sunday, December 4th.
The Commonwealth also called Barbara Tucker (“Tucker”), a co-worker of Conkey’s who testified under an immunity agreement with the Commonwealth. Tucker had been carrying on an affair with Conkey for three years prior to Sale’s death. Tucker testified that on the morning of Wednesday December 13,1994, she saw Conkey take a closed bowling ball bag from his closet. Tucker repeatedly asked Conkey what was in the bag, and he replied, “nothing.” When Tucker dropped Conkey off for work that morning he was holding the bag, although she never saw the bag again after that date.
In keeping with the defense that Conkey was a burglar, but not a murderer, Conkey’s trial counsel elicited testimony from Tucker that in October 1994, Conkey told her that he liked to break into people’s houses when they were home, because otherwise it was not a challenge. Throughout the summer and fall of 1994, Conkey gave Tucker several items, including jewelry, compact discs, binoculars, and a laptop computer, which he claimed to have taken during various house breaks. The Commonwealth objected to Tucker’s testimony on the grounds that it was extremely prejudicial to Conkey, since the jury might conclude that because Conkey admitted to committing numerous house breaks, he also broke into Sale’s house and killed her. Conkey’s trial counsel declined to elaborate on his reasoning, but he was allowed to continue with this line of questioning after assuring the court that he had discussed the issue with his client. Additionally, trial counsel requested that the court not give an instruction to the jury to the effect that Tucker’s testimony concerning Conkey’s break-ins could only be considered in connection with Conkey’s state of mind, and not as indicative of a propensity to commit bad acts.
Conkey called eight witnesses at trial in an effort to persuade the jury that Dr. Laing had the opportunity, motive, and means to kill Sale. The defense called Dr. Laing’s former fiancee, Mary McAlary (“McAlary”), who testified that on the evening of December 3rd, 1994, she returned home from a holiday party with Dr. Laing between 10:00 PM and 10:30 PM. McAlary and Dr. Laing watched the beginning of Saturday Night Live at 11:30 PM, and then she fell asleep. McAlary did not see Dr. Laing again until the following morning. According to McAlary, Dr. Laing was an insomniac who often got up during the night and would do work or “go out and drive around.” McAlary, on the other hand, described herself as a very heavy sleeper. McAlary testified that Dr. Laing was upset with her for having told the police that he frequently went out during the night, as this “made him sound as if he were guilty.”
The defense also called Susan Oak, the former president of Dr. Laing’s company. Oak testified that she thought Dr. Laing had told her in December 1994 that he was concerned that the police would find his fingerprints on the phone in Sale’s bedroom, because while he was doing repairs in Sale’s bedroom he had fallen, knocked the phone over, and then picked it *694 back up again. Oak acknowledged that she could not recall whether this information came directly from Dr. Laing, or whether the information came from someone else.
The defense presented testimony from some of Sale’s neighbors, who testified that they saw lights on in Sale’s house between Sunday, December 4, 1994 and Tuesday, December 6, 1994, even though the house was dark when the police discovered Sale’s body. Conkey used this testimony to buttress his contention that Sale’s killer must have had access to her house in the days after she was killed. The defense also called Thomas Connolly, a carpenter who was doing work at a house located at 1009 Massachusetts Avenue on the morning of December 3,1994. Connolly testified that as he was pulling into the driveway of the house, he noticed a man with straggly reddish-brown hair walking quickly down the street. When the man saw Connolly turning into the driveway, he covered up his head with a beige kerchief and walked away. Connolly later told the police that he recognized the man as Dr. Laing after he saw Dr. Laing being interviewed on television subsequent to Sale’s death. Dr. Laing, who had moved to Oregon some time after Sale’s death, asserted his Fifth Amendment right not to testify at trial during a pretrial telephone conference.
In addition to his contention that it was actually Dr. Laing who killed Sale, the second prong of Conkey’s defense at trial involved an attack on the quality of the criminal investigation into Sale’s death. The two focal points of this defense concerned the Commonwealth’s failure to conduct forensic testing on the hairs recovered from Sale’s pajama top, and on the speck of blood found on the note from Sale to Dr. Laing. With regard to the hairs, Conkey elicited testimony that a microscopic examination performed by the Commonwealth revealed that none of the three hairs were consistent with either Sale or Conkey. Despite the evidence against Dr. Laing, the Commonwealth never compared the hairs with Dr. Laing’s hair, nor did it conduct DNA testing on the hairs. Likewise, although the red stain on the note was identified as blood, a prosecutor in the District Attorney’s Office ordered the FBI lab to discontinue further forensic testing on the stain because it “led . . . nowhere.”
In his closing argument, Conkey’s trial counsel summed up the defendant’s theory of the case as follows:
Craig Conkey was in the habit of breaking into houses and taking things from houses ... he enjoyed going into houses where people werewhere he felt people would be in there because he thought it was more exciting, he thought it was more of a challenge ... You may not like it, but that’s who he is . . .
In the days following this event the police did an investigation. Craig Conkey lied to those police officers but now you know the truth because he eventually had to say, “Yeah, I was in there ...” And he says he has thoughts, should I call the police, and he picks up the phone. He’s a burglar, what is he going to say? “I’m a burglar in the middle of a burglary and I just found a dead body?”
So he doesn’t make, the call. And of course, because of various activities by sixteen or sosixteen to twenty law enforcement personnel on scene, crime scene services and all the activity that they describedand I’m not going to go into all of the activities that they did do, didn’t do, should have done. But we don’t. . . have the benefit of having a nice clean phone to see is his print on it. . .
But think of this. Ms. McAlary is asleep. Mr. Laing has keys to this apartment. He lives four, five, or six doors down. It’s his habit to be up and about in the middle of the night. He sees the lights on in Maiylou Sale’s home. He’s physically attracted to her, sexually attracted to her ... So, Ronald Laing shows up, ladies and gentlemen. Maybe he comes in with the key ...
[Sale’s] like, “Oh, what am I going to do. I can’t scream at him, he’s my landlord but I want to be firm, what are you doing here,” and he makes some story about the list and all of the work he has to do. Maybe he wants to take a look. Maybe, “I couldn’t sleep tonight, so can I just look at this, that or the other thing.” And he comes upstairs . . .
Lieutenant Foley, in his affidavit, made mention of the fact there were many valuables untouched . . . Doesn’t that suggest to you that someone who was in here who did this realized that he had to make it look like something that it wasn’t? In other words, this is a sexual assault that never happened. He [Dr. Laing] had to make it look like a burglary so he grabs a couple of earrings and so on that are in plain view.
(Tr. XI/49, 68, 70-71, 76-77, 85.)
At sidebar after closing arguments, this court noted, on the record, its impressions of trial counsel’s performance:
In many criminal cases I like to make some brief note on the record as to my observations of defense counsel’s performance by way of making a simultaneous or, I should say, contemporaneous record of my view as to how counsel has performed in the event there is some later claim of ineffective assistance. And I want to note that I think Mr. Courtney’s closing was extremely effective, addressing the evidence in a clear and coherent manner and making strong and effective points . . .
Likewise, during cross examination and direct exam of the defense case, Mr. Courtney has performed extremely well. I note in particular very effective cross examination of Trooper Cameron, Captain Corr, the FBI agents, Trooper Sennott and *695 Lieutenant Foley. I don’t mean to include only those people.
(Tr. XI/118-19.)
II. DISCUSSION
Conkey’s position, as stated in his motion for post-conviction relief, is that the failure of his trial counsel to conduct forensic tests on the blood stain found on Sale’s note to Dr. Laing, as well as on the three hairs found on Sale’s pajama top, amounted to a violation of Conkey’s right to effective assistance of counsel. Under Mass.R.CrimP. 30(b), a judge may grant a new trial only “if it appears that justice may not have been done.” “Judges are to apply the standard set forth in Rule 30(b) rigorously and should only grant such a motion if the defendant comes forward with a credible reason which outweighs the risk of prejudice to the Commonwealth.” Commonwealth v. Wheeler, 52 Mass.App.Ct. 631, 635-36 (2001), citing Commonwealth v. Fanelli, 412 Mass. 497, 504 (1992). In order to establish that his trial counsel was ineffective, Conkey bears the burden of showing (1) that trial counsel’s conduct fell “measurably below that which might be expected of an ordinary fallible lawyer”; and (2) that trial counsel’s conduct “likely deprived the defendant of an otherwise available, substantial ground of defense.” Commonwealth v. Conley, 43 Mass.App.Ct. 385, 391 (1997), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974); see also Strickland v. Washington, 466 U.S. 668, 690 (1984).
A. First Prong of the Saferian-Strickland Standard
Conkey first argues that trial counsel’s decision not to conduct DNA testing on the note and the hairs amounted to conduct that fell “measurably below that which might be expected of an ordinary fallible lawyer.” Saferian, 366 Mass. at 96. It is well settled that in the context of a motion for new trial based on ineffective assistance of counsel, the court should be highly deferential to the tactical and strategic decisions of the defendant’s trial counsel. Commonwealth v. White, 409 Mass. 266, 272-73 (1991) (noting that review of tactical and strategic decisions should be performed in a deferential manner, so as “to avoid characterizing as unreasonable a defense that was merely unsuccessful’j (internal citations omitted). The policy rationale underlying such a deferential standard of review was explained by the Supreme Court in Strickland:
It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.”
Strickland, 466 U.S. at 689 (internal citations omitted). Rather than merely unreasonable, the Supreme Judicial Court has required that the “challenged tactical judgments must be ‘manifestly unreasonable.’ ” White, 409 Mass. at 272-73, quoting Commonwealth v. Adams, 374 Mass. 722, 728 (1978).
However, the fact that trial counsel’s challenged conduct may be characterized as a trial tactic does not render such decisions immune from scrutiny. Conley, 43 Mass.App.Ct. at 391, citing Adams, 374 Mass. at 729. In certain limited circumstances, the courts have recognized that trial counsel’s failure to investigate potentially exculpatory evidence, even if based on tactical considerations, may be considered manifestly unreasonable. See, e.g., Commonwealth v. Martin, 427 Mass. 816, 822 (1998); Commonwealth v. Haggerty, 400 Mass. 437, 442 (1987); Conley, supra at 395. Relying on these decisions, Conkey argues that the tactical decision made by his trial counsel not to conduct forensic testing on the hairs and the note was manifestly unreasonable.
In Martin, the Supreme Judicial Court held that trial counsel’s decision not to effectively rebut the Commonwealth’s evidence that the drug LSD caused the victim’s death was manifestly unreasonable. Martin, 427 Mass. at 822. Despite the fact that no reliable scientific test had confirmed the presence of LSD in the victim, trial counsel’s sole avenue of defense was that it was the defendant’s fourteen-year-old daughter who had administered drugs to the victim shortly before his death. In analyzing whether trial counsel’s decision not to pursue the cause of death question could be considered a reasonable tactical choice, the Court stated:
There was no inhibiting conflict between arguing the cause of death issue and presenting the testimony of the defendant’s daughter Teasha that she, acting alone, had put a drug in [the victim’s] food. This case does not involve a reasonable tactical decision. The force of Teasha’s confession was weakened by the fact that she was effectively beyond prosecution for her alleged actions while a juvenile.
Id. Stated otherwise, the Court concluded that trial counsel in Martin had little to lose, and much to gain, by pursuing the issue of whether LSD caused the victim’s death. See id.
*696 While trial counsel in Martin lacked any sound basis for his decision not to investigate the causation issue, in this case Conkey’s trial counsel had a valid, well-founded reason not to conduct any forensic testing on the note and the hairs. The defense strategy at trial was to attack the quality of the criminal investigation into Sale’s death, while arguing that it was actually Dr. Laing who had killed Sale.[1] In furtherance of this defense strategy, trial counsel repeatedly questioned the motive for the Commonwealth’s decision not to conduct any forensic testing on the hairs and the note, in light of the fact that Dr. Laing was the initial target of the police investigation into Sale’s death. As trial counsel stated in his affidavit, “After I had time to evaluate the evidence in light of my trial strategy, I came to believe that we might be better off notperform-ing any testing as that [sic] this would allow us to suggest that the Commonwealth’s decision not to conduct such testing indicated that they were concerned that the results might be exculpatory.’’ (Courtney Affidavit at par. 4.)
Therefore, trial counsel was placed in a precarious position with regard to whether or not to pursue forensic testing on the hairs and the note. There were two ways in which DNA testing on the hairs and the note could have seriously compromised the viability of Conkey’s defense. First, if the results of the tests implicated Conkey, then the Commonwealth would undoubtedly have used those results to rebut the defendant’s claim that Dr. Laing killed Sale, or as affirmative evidence to support its contention that Conkey killed Sale. Second, given the two-pronged strategy advanced by the defense, if the tests implicated anyone else besides Dr. Laing, then this would have weakened Conkey’s claim that Dr. Laing killed Sale.[2]
Finally, as will be discussed further in Section 11(B), infra, even if the forensic testing on the note and the hairs implicated Dr. Laing, it is unlikely that such results would have influenced the jury’s verdict. As his affidavit indicates, trial counsel was well aware of the potential drawbacks of conducting forensic testing on the hairs and the note. This is hardly a case like Martin, supra, where trial counsel made a manifestly unreasonable decision not to pursue the cause of death issue, when doing so could have only strengthened the defendant’s case,
This court does not agree with Conkey’s contention that trial counsel could have had the forensic testing conducted without revealing the results to the Commonwealth. Since both the note and the hairs were in the Commonwealth’s possession, trial counsel would have had to file a motion with this court for an order of discovery to allow for such testing. MassR.Crim.P. 14(a)(2). Where forensic testing on a substance of limited quantity may potentially consume and destroy the entire sample, the most feasible procedure would have been to allow for one test to be performed in the presence of both parties.[3] Furthermore, fairness would have required that both parties be given access to the test results.
The fact that the results of any forensic testing on the hairs and the note would likely have been known to both parties distinguishes the matter at bar from another case relied upon by Conkey, Commonwealth v. Haggerty, 400 Mass. 437 (1987). In Haggerty, the defendant was convicted of first degree murder stemming from an incident which took place on June 16, 1982, in which the victim was badly beaten inside her apartment. Id. at 438-39. The victim, who was 82 years old and had a history of heart trouble, was taken to the hospital after this incident, where she remained until her death on August 11, 1982. Id. at 439. At trial, the Commonwealth presented expert testimony to establish that the victim had suffered a heart attack on June 16th, and that this heart attack was the proximate cause of her death two months later. Id. Defense counsel cross-examined the Commonweath’s experts on the possibility that the victim suffered another heart attack on August 11th that was unrelated to the trauma of June 16th, but he offered no expert testimony to support this defense.
Although trial counsel in Haggerty obtained funds to hire an expert, he ultimately decided not to pursue this strategy for fear that if the expert’s opinion was adverse to the defendant, it might become available to the Commonwealth through the rule of reciprocal discovery in criminal cases, and the Commonwealth could then use this evidence at trial. Haggerty, 400 Mass. at 440-41. As the Court pointed out, however, defense counsel’s belief was based upon a plain misreading of Rule 14(a)(3)(A) of the Massaachusetts Rules of Criminal Procedure. Id. at 441. Since Rule 14(a)(3)(A) allows the Commonwealth reciprocal discovery only of material which the defendant intends to use at trial, the Court noted that if the expert’s opinion was unfavorable to the defendant, trial counsel need not have called the expert at trial, nor would he have had to disclose the expert’s identity to the Commonwealth. Id. Therefore, the Court held that trial counsel’s rationale for not investigating the causal relationship between the victim’s death and the defendant’s conduct “simply was wrong,” and that this failure to investigate amounted to ineffective assistance of counsel. Id.
As noted previously, in this case trial counsel could not simply retain an expert to perform independent forensic testing on the note and the hairs, and then opt not to share the results with the Commonwealth if those results were unfavorable to Conkey. The testing would have either been performed by the Commonwealth and the defendant separately or jointly, with the results available to both parties. The Supreme Judicial Court’s decision in Haggerty is therefore distinguishable from the matter at bar in a significant respect. Given that the results of any forensic testing *697 on the hairs and the note would have been known to both parties, Conkey’s trial counsel had to carefully consider the implications of proceeding with the testing, in light of his strategy at trial. As his affidavit demonstrates, trial counsel was well aware of the potential ramifications if he chose to conduct the testing.
In another case relied upon by Conkey, Commonwealth v. Conley, 43 Mass.App.Ct. 385, 395 (1997), the Appeals Court held that trial counsel’s failure to file a motion for forensic investigation of a knife recovered from the crime scene, despite the strong request of the defendant to conduct such testing, was manifestly unreasonable. In that case, the defendant was convicted of assault and batteiy by means of a dangerous weapon stemming from an altercation he had with the victims, Donald Hurld and James Richard. Conley, 43 Mass.App.Ct. at 385-86. The Commonwealth’s version of events was that after the defendant had used a straight-edged razor to inflict injuries on both of the victims, Richard took out a knife and chased the defendant away from the scene. Id. at 386-87. The only weapon recovered by the police was Richard’s knife. Id. at 388. The defendant, on the other hand, testified that while he and Richard were wrestling for control of Richard’s knife, the knife came down across Hurld’s face. Id. at 387-88. After the defendant fled the scene, he testified that he turned around and saw Richard wiping the knife. Id. at 388.
Prior to trial, the defendant in Conley requested that his attorney file a motion for forensic testing of the knife that was recovered from Richard. Conley, 43 Mass.App.Ct. at 388. The defendant insisted that the knife be tested because if his blood, or the blood of Richard or Hurld was found on the knife, then this would lend credibility to the defendant’s version of events. Id. As the defendant testified at the hearing on his motion for a new trial:
And I said if [Richard] says he didn’t cut anyone with that knife then my blood and Hurld’s blood shouldn’t be on that knife. And [trial counsel] said correct. I said, well, you know, let’s have the knife tested. I’m sure, I’m positive that our blood would be on that knife somewhere. [Trial counsel] said, well, I want you to think. [Trial counsel] said if the blood isn’t on the knife then, like, there might be some problem with your story. I said I don’t have anything to think about. I said I want you to file a motion to have that knife tested immediately.
Id. at 390. The defendant reiterated his desire to have the knife tested on multiple occasions prior to trial, and trial counsel indicated “at least once” that he would file a motion for forensic testing. Id. at 389. At some point during or after the trial proceedings, trial counsel told the defendant that the motion had been filed and denied. Id. Trial counsel never actually filed the motion, because it was “not uppermost in [his] mind,” and because he felt that the better trial strategy would be to exploit the police failure to conduct forensic testing as a basis for showing that the investigation was ineptly conducted. Id. at 389, 391.
The Appeals Court began its analysis by noting that “[t]he decision challenged here is the decision not to investigate the knife despite the strong request of the defendant." Conley, 43 Mass.App.Ct. at 392 (emphasis added). The Court then stated: “The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions ... inquiry into counsel’s conversations with the defendant may be critical to a proper assessment of counsel’s investigation decisions.” Id. at 392-93, quoting Strickland, 466 U.S. at 695-96. Reviewing the record with this consideration in mind, the Court observed:
[T]he defendant testified that he told counsel that he was “positive” that his blood and that of the alleged victims “would be on the knife.” That he was insistent that the blood be tested was corroborated by his attorney. There is nothing in the record to suggest that counsel had any reason to believe his client was untruthful. As to the factual basis of his assertion, there is no doubt that the defendant had superior knowledge.
Conley, 43 Mass.App.Ct. at 395. Given the defendant’s superior knowledge as to what the results of the test would show, his insistence that the testing be performed, and the fact that the Commonwealth’s case depended almost entirely on the credibility of the two victims, the Court concluded that trial counsel’s failure to file a motion for forensic investigation of the knife was manifestly unreasonable. See id.
On its face, this case appears to be factually similar to Conley. However, there are two key distinctions between Conley and this case. First, the defendant in Conley put forth a significant amount of evidence regarding the substance of his conversations with trial counsel, to the effect that the defendant insisted on having the forensic testing performed.[4] The evidence before this court, however, indicates that Conkey actually agreed with trial counsel’s strategy not to conduct testing on the note and the hairs.[5]
The only evidence before this court on the issue of the substance of the communications between trial counsel and the defendant consists of trial counsel’s two and one-half page affidavit. The portions of this affidavit recounting communications between trial counsel and Conkey provide as follows:
(3) During the first few meetings in which these items were discussed, Mr. Conkey informed me that he was unhappy that his first lawyer William Crowe, Esq., had failed to order any DNA testing on the hairs or the bloodstain and insisted that he wanted both the bloodstain and the hairs subjected to DNA testing. Mr. Conkey was quite adamant about this. *698 (5) As the case was being prepared for trial, Mr. Conkey and I had ongoing discussions about this issue in light of our overall trial strategy. Mr. Con-key eventually agreed with my suggestion that, as a tactical matter, we were better off not doing the testing, although I was aware that he continued to harbor doubts about this. Mr. Conkey was never the least bit reluctant to have the testing done.
Trial counsel’s affidavit does not establish that Conkey’s desire to have the note and the hairs tested was continuous and pervasive. To the contrary, this evidence falls well short of placing an obligation on trial counsel to conduct such testing. See Commonwealth v. Thurston, 53 Mass.App.Ct. 548, 551 (2002) (noting that the credibility, weight, and impact of affidavits submitted in connection with a motion for a new trial are entirely within the judge’s discretion). The affidavit indicates that while Conkey may have initially wanted to have the note and the hairs subjected to DNA testing, after counsel explained the potential drawbacks of testing, Conkey agreed that not conducting the testing would be more beneficial to his defense. Conkey cannot now claim that a reasonable tactical decision made by trial counsel, with Conkey’s express agreement, amounted to manifestly unreasonable conduct and ineffective assistance of counsel.
The second distinction between Conley and this case concerns the issue of a defendant’s “superior knowledge” of the results of the requested investigation. In Conley, the defendant asserted that it was Richard’s knife that had inflicted injuries upon Hurld and the defendant during the altercation, and that therefore he was “positive” that his blood and Hurld’s blood would be found on Richard’s knife if testing was conducted. Conley, 43 Mass.App.Ct. at 388, 395. The fact that the defendant had superior knowledge that the results of testing would be exculpatory contributed to the Court’s conclusion that trial counsel’s failure to file the motion for forensic investigation of the knife was manifestly unreasonable. Id. at 395; See also United States v. Baynes, 687 F.2d 659, 668 (3d Cir. 1982) (defendant had superior knowledge that a comparison between a voice exemplar containing his voice and the voice on an incriminating intercepted phone call would establish that it was not the defendant’s voice on the intercepted call); Jones v. Wood, 114 F.3d 1002, 1011-12 (9th Cir. 1997) (defendant had superior knowledge that testing the blood found on his clothes would reveal that the blood came from a cut on his hand, rather than from the victim’s wounds); Contrast Government of the Virgin Islands v. Weatherwax, 77 F.3d 1425, 1432 (3d Cir.), cert. denied, 519 U.S. 1020 (1996) (defendant had no superior knowledge as to whether a juror who had been seen carrying a newspaper containing an unfavorable article about the defendant had read the article and been prejudiced thereby; trial counsel’s tactical decision not to inform the judge of the possibility of prejudice, despite defendant’s request to do so, not ineffective assistance of counsel).
In this case, Conkey had no superior knowledge as to what the results of DNA testing on the hairs and the note would reveal. His contention that the results of such testing would implicate Dr. Laing is wholly speculative, and accordingly this case is far more analogous to Weatherwax than to Conley. Having failed to sátisfy his burden of establishing that trial counsel’s tactical decision not to conduct DNA testing on the hairs and the note was manifestly unreasonable, Conkey’s motion for a new trial must be denied. See White, 409 Mass. at 272-73.
B. Second Prong of the Saferian-Strickland Standard/MassR.Crim.P. 30(c)(5)
Conkey asks this court to grant him funds, pursuant to Mass.R-Crim.P. 30(c)(5), to proceed with forensic testing on the note and the hairs, so that he may then have a fully-developed factual basis for his claim of ineffective assistance of counsel. Stated otherwise, Conkey seeks an order of this court allowing him to proceed with testing that he claims would show that trial counsel’s decision not to conduct the testing deprived Conkey of an otherwise available, substantial ground of defense. Commonwealth v. Saferian, 366 Mass. at 96.
Rule 30(c)(5) of the Massachusetts Rules of Criminal Procedure was amended in 2001 to include the following provision: “The court, after notice to the Commonwealth and an opportunity to be heard, may also exercise discretion to allow the defendant costs associated with the preparation and presentation of a motion under this rule.” The Reporter’s Notes to Rule 30(c)(5) state, in relevant part:
By amendment in 2001, this subsection gave judges discretion to allow for the payment of costs associated with the preparation and presentation of a new trial motion. Such costs may include . . . paying for scientific testing. As with the decision to appoint counsel, there is no constitutional right to have the state pay for these types of costs associated with a new trial motion. See Commonwealth v. Davis, 410 Mass. 680, 684 n.7 (1991). But where the defendant seeks costs that are reasonably nec-essaiy to develop support for a well founded basis for granting a new trial, it is appropriate for the judge to exercise discretion and allow the request. In making the decision to allow costs associated with a new trial motion, the judge should take into account the likelihood that the expenditure will result in the defendant’s being able to present a meritorious ground for a new trial. Where the request concerns scientific testing of evidence in the Commonwealth’s possession, as with DNA analysis, the court should consider a request for funds in conjunction with the appropriate discovery motion under subsection (c)(4) seeking access to the evidence in question . . . The sound exercise of a judge’s discretion to allow the defendant costs will depend in part on the evaluation of the legal theory which the expenditure of funds would support.
*699 Under Mass.R.Crim.P. 30(c)(4), a defendant is not entitled to access forensic evidence in the Commonwealth’s possession unless he can make a prima facie showing that the test results would warrant a new trial.[6] Commonwealth v. Evans, 439 Mass. 184, 204-05 (2003), citing Commonwealth v. Tague, 434 Mass. 510, 519 (2001), cert. denied, 534 U.S. 1146 (2002). Therefore, the key inquiry is whether Conkey has made a prima facie showing that the forensic testing now sought “would have produced results that likely would have influenced the jury’s conclusion.” Evans, 439 Mass. at 205.
In Feans, supra, the defendants moved for a new trial, as well as for funds to conduct forensic testing pursuant to Rule 30(c)(5), after they were convicted of first degree murder. Id. at 186. The defendants argued, inter alia, that their trial counsel had been ineffective for failing to investigate and develop forensic evidence, and that funds were necessary to conduct forensic testing to support their claim of ineffective assistance of counsel. Id. at 201, 204. In affirming the trial court’s denial of the defendants’ motion for a new trial without an evidentiary hearing, the Supreme Judicial Court concluded that “there was no reason for counsel to believe that any testing would benefit the defense or that any hoped for results would likely have influenced the jury’s conclusion.” Id. at 201, citing Commonwealth v. Wright, 411 Mass. 678, 682 (1992). Since the defendants failed to make a prima facie showing that the forensic testing “would have produced results that likely would have influenced the jury’s conclusion,” the Supreme Judicial Court also affirmed the trial court’s denial of the defendants’ Rule 30(c) (5) motion for funds. Id. at 204-05.
In this case, as in Evans, the defendant has failed to make a prima facie showing that forensic testing on the hairs and the note would have yielded results that likely would have influenced the jury’s verdict. Even assuming, arguendo, that DNA testing on the hairs established that they belonged to Dr. Laing, this fact would not have significantly weakened the Commonwealth’s case against Conkey. See Evans, 439 Mass. at 201-02 (trial counsel’s decision not to perform blood and fingerprint analysis not ineffective where “favorable” results for the defendants would not have undermined the Commonwealth’s case). Dr. Laing was the owner of Sale’s rented house, and he had been in Sale’s bedroom just days before she was killed. FBI Special Agent Christopher Hopkins testified at trial that, on average, a person sheds approximately one hundred hairs per day. (Tr. VII/76.) If DNA testing revealed that the hairs belonged to Dr. Laing, then the Commonwealth could have plausibly argued that the hairs might have been shed at any time during the weeks and months leading up to Sale’s death.
Conkey relies primarily on the fact that one of the hairs had been “forcibly removed” to support his position that DNA testing linking this hair to Dr. Laing would likely have influenced the jury’s conclusion. Conkey contends that this single hair had “apparently been forcibly removed or pulled,” and that this “seems to have [occurred] during a struggle.” (Conkey Memorandum at pp. C-28, A-7.) Conkey overstates the testimony of FBI Special Agent Christopher Hopkins. Special Agent Hopkins testified that there are a number of ways that a hair could be forcibly removed, and more importantly for purposes of this case, he never testified that the hair recovered from Sale’s pajama top had been forcibly removed during a struggle. To the contrary, Special Agent Hopkins acknowledged that he could not ascertain: (1) the amount of force used to remove the hair; (2) whether the hair had been transferred directly or indirectly to Sale’s pajama top: or (3) when the hair had been removed.
Notwithstanding Conkey’s assertion that the hair was forcibly removed “during a struggle,” there is no indication as to how or when this hair was in fact removed. Therefore, even if DNA testing revealed that the source of the forcibly removed hair was Dr. Laing, this fact does little to weaken the Commonwealth’s case against Conkey. As noted previously, the Commonwealth acknowledged that Dr. Laing had been present in Sale’s bedroom just days prior to her death. In light of Special Agent Hopkins’ testimony regarding the numerous ways in which a forcibly removed hair could have ended up on Sale’s pajama top, the Commonwealth could have advanced a credible explanation in the event that DNA testing revealed that the hair belonged to Dr. Laing.
The Commonwealth’s case against Conkey, although based almost entirely on circumstantial evidence, was strong nevertheless. Since Conkey admitted to being in Sale’s bedroom the night of her death, the jury was asked to choose between two conflicting versions of events. The Commonwealth’s case hinged on the asserted implausibility of Conkey’s story. In his dosing argument, the prosecutor focused upon the inconsistencies in Conkey’s story, particularly his initial insistence that he had never been inside Sale’s apartment. Even if DNA testing had revealed a match between the hairs found on Sale’s pajama top and Dr. Laing, there is simply no reason to believe that these results would likely have influenced the jury’s conclusion. Evans, 439 Mass. at 201, citing Commonwealth v. Wright, 411 Mass. 678, 682 (1992).
Likewise, for many of the reasons discussed above, Conkey has failed to make a prima facie showing that the results of DNA testing of the blood on the note would likely have influenced the jury’s verdict. Conkey asserts that if it was Sale’s blood on the note, then “evidence that Laing was in possession of a note with the victim’s blood on it would have strongly suggested that Laing was present in the victim’s bedroom at the time of the killing or immediately thereafter when her blood was still wet.” (Conkey Memorandum at p. A-6.) Again, the Commonwealth could have plausibly explained the existence of a speck of Sale’s blood on a note in Dr. Laing’s possession.[7]
*700 The note, dated November 28,1994 and written and signed by Sale, was obviously in Sale’s possession for at least as long as it took her to write and deliver the note to Dr. Laing. The Commonwealth could have plausibly argued that the source of the small speck of blood on the note was a paper cut, or some other minor cut or scrape. Conkey’s theory, that the presence of a speck of Sale’s blood on the note would have strongly suggested that Dr. Laing killed Sale, is wholly speculative. See Commonwealth v. Duran, 435 Mass. 97, 103 (2001) (“Speculation, without more, is not a sufficient basis to establish ineffective representation”). Conkey has therefore failed to make a prima facie showing that the results of DNA testing would likely have influenced the jury’s conclusion.[8]
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant Craig W. Conkey’s motion for a new trial and other related post-conviction relief is DENIED.

The tactic of questioning the quality of the criminal investigation, commonly referred to as the Bowden approach in light of Commonwealth v. Bowden, 379 Mass. 472 (1980), is a well-founded criminal defense trial strategy. See Commonwealth v. Rivera, 424 Mass. 266, 274 (1997) (“The failure of the authorities to conduct certain tests is a permissible ground on which to build a defense”).

Moreover, if the results of the tests were inconclusive, and the Commonwealth chose not to introduce them into evidence, the Massachusetts Rules of Professional Conduct may have precluded Conkey’s trial counsel from arguing to the jury that had DNA testing been done, the results would have implicated Dr. Laing as Sale’s killer. Mass.R.Prof.C. 3.3(a)(1), 426 Mass. 1301, 1383 (1998) (“A lawyer shall not knowingly make a false statement of material fact... to a tribunal”).

The affidavits provided by Charlotte Word, Ph.D. and Terry Melton, Ph.D. on behalf of the defendant do not address the issue of whether, as of the time trial counsel was preparing his case, DNA testing would have consumed or destroyed the entire sample of blood and hairs. Even if the testing would not have consumed the entire sample, in all likelihood if the defense tested the note and the hairs, the Commonwealth would have conducted forensic testing as well. It is inconceivable that the Commonwealth, and this court, would have permitted Conkey to have sole access to this physical evidence.

Mindful that “ ‘inquiry into counsel’s conversations with the defendant may be critical to a proper assessment of counsel’s investigation decisions,’ ” Conley, 43 Mass.App.Ct. at 392-93, quoting Strickland, 466 U.S. at 691, this court requested well in advance of the hearing on this matter that trial counsel be made available to testify. See Commonwealth v. Kelly, 57 Mass.App.Ct. 201, 208-10 (2003) (discussing the importance of testimony and detailed affidavits in support of a defendant’s motion for a new trial). However, for reasons unclear to this court, Conkey opted not to have trial counsel testify at the hearing. Conkey himself chose not to testify at the hearing, nor did he submit an affidavit. In Conley, both trial counsel and the defendant submitted affidavits in connection with the defendant’s motion for a new trial, and trial counsel and the defendant also testified at an evidentiary hearing on the defendant’s motion. Conley, 43 Mass.App.Ct. at 388-89.

In dicta, the Conley Court stated: “Where the facts are not known to the attorney, and the information is critical to the client’s defense, counsel may not decline to investigate because he fears the facts may become available to the Commonwealth.” Conley, 43 Mass.App.Ct. at 393, citing Commonwealth v. Haggerty, 400 Mass. 437, 441 (1987). As noted previously, in Haggerty the Supreme Judicial Court found that counsel’s rationale for not investigating the cause of death issue was based on a plain misreading of Mass.R.Crim.P. 14(a)(3)(A), since that provision only mandates reciprocal discovery of material which the defendant intends to use at trial. Haggerty, 400 Mass. at 441. The reading of Haggerty provided by the Appeals Court would seem to foreclose the exercise of discretion by trial counsel not to conduct forensic testing in situations where, as in this case, joint testing or reciprocal discoveiy would have been required, and where the defendant himself expressly agreed not to pursue the testing. This court does not view the above-quoted language from Conley as controlling on the issue at bar, nor does the court find, for the reasons set forth in Section 11(B), infra, that the results of the testing requested by Conkey would have been “critical to the client’s defense.” Conley, 43 Mass.App.Ct. at 393.

The Reporter’s Notes to Mass.RCrim.P. 30(c)(4) state: “Discovery in the context of a new trial motion is not a matter of right. The motion must first establish a prima facie case for relief before discovery is available.”

Indeed, the prosecutor asked the jury during closing arguments to assume that the speck of blood on the note belonged to Sale, and then went on to argue that such a finding was irrelevant as to who killed Sale:
What would further tests on that note do? We know that note came from Marylou, we know it was responded to, we know it was in her house at some point in time and we know it was in Dr. Laing’s house at some point in time. If it’s Dr. Laing’s blood, so what? If it’s Marylou’s blood, so what? If that note somehow is connected with this crime, don’t you thinkyou’re going to see that note. Don’t you think there would be a little bit more, even if it is human blood? The only time it would matter, ladies and gentlemen, is if it was Craig Conkey’s blood. No shame on us for not doing that. Another non-issue.
(Tr. XI/100-01.)

Conkey has also failed to demonstrate that the prosecutor’s comments during closing argument with respect to the hairs and the note, which were not objected to at the time they were made, created a “substantial risk of a miscarriage of justice.” Commonwealth v. Orben, 53 Mass.App.Ct. 700, 703 (2002). The prosecutor’s comment about the note, set forth in n.7, supra, was clearly permissible, since it was a fair inference based on the evidence. See Commonwealth v. Passley, 428 Mass. 832, 835-36 (1999). Although the prosecutor’s comment about the hairs, in which he suggested that Special Agent Hopkins testified that the three hairs were actually dog hairs, was not exactly a fair inference based on Agent Hopkins’ actual testimony, this court concludes that in the circumstances of this case, the comment did not create a substantial risk of a miscarriage of justice. The jury was instructed not to consider the statements made in closing arguments as evidence, Conkey’s trial counsel did not object to the prosecutor’s comments, and, as noted previously, the issue of the hairs was not likely to have impacted the jury’s verdict. See Passley, 428 Mass. at 837-38 (concluding that, even though “the prosecutor’s closing argument went somewhat beyond the testimony and the permissible inferences,” there was no substantial risk of a miscarriage of justice because, inter alia, the jury was instructed not to regard the closing arguments as evidence, and there was no objection to the closing): see also Commonwealth v. Ruddock, 428 Mass. 288, 292 n.3 (1998).